162 So.2d 397 (1964)
STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellee,
v.
OUACHITA PARISH SCHOOL BOARD, Defendant-Appellant.
No. 10140.
Court of Appeal of Louisiana, Second Circuit.
February 13, 1964.
Rehearing Denied April 13, 1964.
Writ Refused May 27, 1964.
George M. Snellings, Jr., Monroe, for appellant.
D. Ross Banister, Glenn S. Darsey, Braxton B. Croom, Norman L. Sisson, Chester E. Martin and Jesse S. Moore, Jr., Baton Rouge, for appellee.
Before HARDY, GLADNEY and BOLIN, JJ.
BOLIN, Judge.
This case had its genesis in the expropriation by the Louisiana State Department of Highways of a certain block of land in Monroe, Louisiana, belonging to defendant Ouachita Parish School Board, taken for use in constructing an approach *398 to the new Ouachita River bridge built in connection with Interstate Highway 20. Defendant school board filed an answer, agreeing the amount of $171,600 deposited by the department was sufficient to reimburse it for the block acquired, but alleged this was a partial rather than a total taking and asked severance damages to its remaining property in the amount of $1,755,345.90, inclusive of the amount already deposited.
The lower court referred the question of whether this was a total or partial taking to the merits, trial was had and the court concluded the taking was partial but that plaintiff's "cost to cure" method, i. e., the amount estimated as necessary to acquire additional playground, was applicable and awarded the school board $144,350 as severance damages. From this judgment defendant appeals asking this Court for an increase of the award to $1,583,745.90, exclusive of the amount deposited. Alternatively, as severance damages, defendant asks for the sum of $795,763.20, representing the actual cost of $1,103,500 for a new school constructed by it on Nutland Road to replace the one damaged by the taking, less the $171,600 previously deposited, and less the residual value of the old plant, $136,136.80. Plaintiff answered the appeal alleging the finding that this was a partial taking was erroneous, and in the alternative requesting a reduction in the award.
Two main issues are involved: first, the correctness of the lower court's determination that the taking was partial and not total (thereby allowing defendant a year from notice of acceptance within which to file an answer asking for severance damages); second, the correctness of the award.
Requisite for a clearer understanding of the present case is some knowledge of prior proceedings between the parties. On December 30, 1960, pursuant to a petition of the highway department an order of expropriation was signed by the district judge. The school board filed an exception of no right of action, a motion to dismiss and a motion for summary judgment, all of which were overruled by the lower court. The earlier proceedings, brought to settle the issue of the power of one state agency to appropriate property belonging to and being used by another state agency, was settled adversely to defendant and terminated in affirmance of the lower court's action by the Louisiana Supreme Court and a denial of defendant's application for Writs of Certiorari by the United States Supreme Court. See State, Through Department of Highways v. Ouachita Parish School Board, 242 La. 682, 138 So.2d 109 (1962); cert. denied, 370 U.S. 916, 82 S.Ct. 1553, 8 L.Ed.2d 497.
Thereafter the State Highway Department filed a rule nisi, requesting a definitive final judgment by the district court on the ground that the expropriation was a total taking; that the sum deposited in the registry of the court was a fair value for the amount of ground expropriated; and that defendant had not filed an answer within the 30 days as required by LSA-R.S. 48:450. It was to this rule defendant filed the answer, referred to in the opening paragraph of this opinion, which resulted in the trial, judgment and the present appeal.
The resolution of the totality or partiality of this taking requires examination of the testimony concerning the unity of ownership and use of the three blocks of land owned by the school board. Unity of ownership was established by deeds of acquisition, the last being dated 1937.
The evidence establishes that on the property involved was located an elementary and junior high school with an annual enrollment fluctuating between one thousand to twelve hundred students ranging in age from six through fourteen.
The school facility was situated on three contiguous blocks, the north block being occupied by the classroom building, separated by Telemaque Street from the center block comprising the playground area, which in turn was separated by Bry Street *399 from the south block occupied by the gymnasium and bandroom. The center block was formerly occupied by a grammar school but in 1957 the use of the building as a school was discontinued and since that date it has been used for storage purposes. The ground surrounding this building was used as a playground for the students, for physical education classes and on occasions as a marching area for the junior high band. Students leaving the classroom building going to the gymnasium building crossed this area many times a day. The smaller children used the playground for free play periods. It was this central square which was expropriated by the highway department and upon which the approach structure for the six-lane, elevated express highway bridge was constructed.
The district court, having heard the evidence on the question of whether the expropriation amounts to a partial or total taking, correctly held this a partial taking under the applicable law, as supported by overwhelming authority, in Department of Highways v. Williams (La.App. 3 Cir., 1961) 131 So.2d 600. In the cited case the court held alleged "separate" tracts, crisscrossed by railroad and pipeline rights of way, constituted one single, integrated tract for unified industrial use as a single industrial plant site. The district court here applied the rule as thus enunciated in the Williams case:
"As stated by the cited treatise authority, ordinarily whether a landowner's holding constitutes a single tract or not for purposes of determining severance damages is a practical question to be decided by the trier of fact, which trier `should consider evidence on the use and appearance of the land, its legal divisions and the intent of the owner and conclude whether on the whole the lots are separate or not. In such cases the land itself rather than the map should be looked at, and one part of the parcel is not to be considered separate and independent merely because it was bought at a separate time from the rest and is separated from it by an imaginary line.' (Nichols, Eminent Domain, § 14.31 pp. 715-716.) * * * As the treatise continues, `a public highway actually wrought and travelled, a railroad, a canal, or a creek running through a large tract devoted to one purpose does not necessarily divide it into independent parcels, provided the owner has the legal right to cross the intervening strip of land or water.'" (Nichols, Eminent Domain, § 14.31 [1] pp. 721, 725, 727.) (Emphasis added.)
Applying that law to the facts the district court held:
"The evidence in this case is clear that the property on the three blocks was used as a unit in the operation of the junior high and elementary school, and even though the central building was not being used for classes the grounds were being used as a playground and these playgrounds are essential for the efficient operation of an elementary school, therefore, in the opinion of this Court the property taken was a partial taking and not a whole taking, and both the defendant and the plaintiff are entitled to introduce evidence proving severance and consequential damages, if any."
We come now to the crucial issue presented by this appeal. Since the taking has been determined to be partial, what then are the damages sustained by the school board? Has the property been rendered completely unfit as a school and if so, is the school board entitled to cost of replacement with or without depreciation? Or is the school board entitled to the entire cost of building a substitute facility, after deduction of the amount already received and the estimated value of the property after the taking? If the school is still fit for school purposes, would the amount estimated by plaintiff's experts as sufficient to acquire additional property for a playground *400 be a "cure" or substitute so as to place the school board in as good position as it was before the taking?
There can be little dispute over the fact that prior to the taking the highest and best use for the property was for school purposes. The school board had selected the site; purchased the property; built the school and gymnasium; purchased an addition to the school for classrooms; and expended $350,000 in 1954 to bring the school plant up-to-date. Until the moment of the taking, the entire facility had been in constant and exclusive use for school purposes.
Classrooms having a floor space of some 108,630 square feet were located on the block north of the property taken; the activities and playgrounds were in the central block; the gymnasium containing 20,374 square feet was used daily for the gym classes, band practice and other athletic activities and was located on the south block. Even when classes were not using the portion taken for play or physical education all students in grades three, four, five, six, seven and eight traversed the playground as many as two to six times each school day.
The overhead portion of the newly constructed "super highway" was approximately level with the third floor classrooms and was only 110 feet from the corner of the classroom building. Experts forecasting traffic trends estimated by 1975 some 43,000 vehicles would daily use the highway in front of the school.
The concrete pilings supporting the highway occupied the principal portion of the expropriated block. Located as it was, south of the school, it would naturally eliminate the beneficial rays of the sun even on the small remaining portion of the school-yard.
Numerous doctors, teachers and school officials testified as to the various hazards to be anticipated when the overhead span is put into use. Mr. Armand L. Lewis, school principal, testified about the required traffic flow of the children among the several buildings in connection with their teaching and instruction program at the school. He testified that although the school is presently being used, it will be abandoned as soon as Nutland School is finished. As to the factors which he considered so detrimental as to require a replacement facility, Mr. Lewis stated there was not enough playground area, it was too dangerous to have a school where the children would have to go from one building to another under the bridge, and the increase in noise would increase distraction from school work.
When asked where the children went (prior to construction) during a fire drill Mr. Lewis replied they "poured out" onto the old grammar school ground where the bridge now crosses. He stated at present it was necessary for them to use Telemaque Street, South Grand Street and the alley between the school and Mulhearn for fire drill maneuvers. On cross-examination Mr. Lewis was asked if the Ouachita Parish School Board had not decided, prior to the adoption of plans for the bridge, to replace the facility in some other location, to which he replied, "No, sir, I don't think so."
Another witness for defendant was J. H. Trousdale, Jr., Monroe attorney, who was president of the school board at the beginning of negotiations with the highway department about acquisition of the school's property. He testified he had written the director of highways on December 18, 1957, that the proposed construction would completely ruin the facility for school purposes.
Introduced in evidence during direct examination of Mr. Trousdale was a resolution by the school board, passed April 19, 1960. This document was mailed to the director of the highway department and advised him the board had resolved the construction of the highway through the middle of the school property would render the property worthless for school purposes; that it would be necessary to construct a new school to take care of the *401 pupils of the Ouachita Parish grammar and junior high school; that the school board did not have adequate funds to pay for the construction of the required new school; and requested early payment by the department of highways of the damages sustained by the board in the loss of said school.
Another witness for defendant was Mr. W. W. Ward, superintendent of the Ouachita Parish School System, whose office was located within a block of subject school. His testimony corroborated that of Mr. Trousdale that the buildings and grounds had been used as an integral unit; that the classroom building was constructed in stages, partially in 1924, 1926, 1928 and 1930. He further testified the gymnasium was built in 1930 and the Peters building was acquired in 1937 and connected to and became a part of the classroom unit at that time. Further, Mr. Ward stated there were no other schools available in the system with enough facilities to absorb the thousand or more students from this school and that Nutland School was built to replace this school because the contemplated overhead highway would, in the opinion of the Ouachita Parish system and of the School Board, ruin the school. He concluded the amount of anticipated traffic on the new structure would be so detrimental by reason of noise, glare of windshields, obnoxious odors and dangerous fumes as to render the site no longer suitable for a school for a thousand to twelve hundred children of this age.
Corroborative of the foregoing conclusions was the opinion testimony of four veteran teachers that the heavily traveled expressway running through the heart of the school would seriously distract both teachers and students and would disrupt the school function.
Mr. Van Odom, the city superintendent of education, considered the site (subsequent to the building of the highway) wholly inadequate for a good school as did Dr. George Walker, President of Northeast Louisiana State College.
Two prominent physicians expressed positive opinions relative to the deleterious effects of traffic noises and fumes from trucks and automobiles on the health and nerves of teachers and students. Both considered the school was rendered unsuitable by the location of the bridge approach.
Mr. Land and Mr. Stubbs, experienced school architects, testified the highway construction through the subject property destroyed its usefulness as a school for small children.
Mr. C. E. Holly, Director of School Housing for the State Department of Education for the past fifteen years, stated that in his judgment the school should be abandoned. This witness served as chairman of the committee of some eighty school superintendents, supervisors, teachers, architects and engineers which in 1954 prepared Bulletin No. 711 specifying housing standards and requirements for selection of school sites for use by the State Department of Education. Its requirements are summarized at page 51:
"The environment of the school site is very important. It should provide: (a) healthful conditions for the pupils and teachers while at school, (b) safe conditions for all while on the school grounds, in the building, and in the immediate neighborhood of the school, (c) freedom from all disturbing noises, such as those resulting from heavy truck, automobile, railway, and airplane traffic and from fire sirens and factory whistles, (d) freedom from obnoxious odors, and (e) pleasing surroundings that will tend to create a feeling of pride, happiness and contentment."
In the opinion of Mr. Lloyd Waite, officer of the National Council on School House Construction since 1950, the "school has lost its effectiveness as an educational institution" and there is no alternative to abandonment of the school facility.
Messrs. Carter, Tharpe and Driggers, appraisers for the State Highway Department, testified only as to the market value *402 of several properties in the neighborhood which they thought the school board might buy or expropriate to substitute on a footage basis for the ground actually occupied by the bridge structure. It was the highest of these estimates which the lower court adopted as the "cost to cure" the damage to the defendant.
With this conclusion we find ourselves unable to agree. On the contrary, we are convinced from our examination of the pleadings, the testimony of the witnesses, and the numerous exhibits including plats, photographs both aerial and eye level, deeds and contracts that the Ouachita Parish Junior High School, located between St. John and South Grand Streets in Monroe, Louisiana, has been completely destroyed as a school facility.
Having concluded the school has been rendered completely useless as an elementary and junior high school we must now determine the proper measure of damages. Defendant has itemized in its petition its claim for severance damages upon the value of the land prior to and after the taking and upon the replacement cost of the buildings without allowance for depreciation. The school board's position is that the only just compensation is the "full and perfect equivalent" of this special purpose property. The further contention is that the only "cure" of the situation was the relocation of its facility; and that the just measure of its severance damage, therefore, was the fair value of the facility thus destroyed, less residual value, or alternatively the actual cost of the new substitute school less the amount deposited and the residual value of the old plant.
It is agreed by both the highway department and the school board that there is no market value for the property as a school and for this reason the usual methods used in determining damages are unavailable. As stated succinctly in Nichols, Eminent Domain, Sec. 12.32, pages 217-238:
"It occasionally happens that a parcel of real estate taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, if he desire to dispose of it he would be unable to sell it at anything like its real value. A church, or a college building, or a club-house located in a town in which there was but one religious society, or college, or club, might be worth all it cost to its owners, but it would be absolutely unmarketable. So, also, in many states an owner of land abutting upon a public street might be satisfied with the fact that he owned the fee of the street, and was thus able to protect himself against the use of the street for other than street purposes without compensation; but it would be almost impossible for him to sell his interest in the street to a private purchaser. Even such a piece of property as a mill site or a reservoir site, or a factory or store of abnormal size may, to a somewhat lesser degree, be difficult to dispose of, though of great value to its owner.
"In such a case as similar property is not commonly bought and sold it is impossible to ascertain market value by the usual tests. In fact, as market value presupposes a willing buyer, the conditions upon which such value is based are not present, and it is sometimes said that in cases of this character market value is not the measure of compensation. As it is conceded that the owner cannot on that account be deprived of his property without any compensation whatever, some other measure is sought. It must, however, be remembered that market value is always based upon hypothetical conditions, and that it is never necessary to show that there was in fact a person able and willing to buy. The measure is still what another religious society, or college, or club, or public service corporation, or abutting owner, would pay if there were one at hand; in other words the measure is still market *403 value. However, since the usual means of ascertaining market value are lacking, other means must from the necessity of the case be resorted to. It is, therefore, proper in such cases to deduce market value from the intrinsic value of the property, and its value to its owners for their special purposes. (citing State [Through Department of Highways] v. Barrow, 238 La. 887, 116 So.2d 703.)
"Special value has been recognized also in a case in which special adaptability to a particular use has been demonstrated. Thus, consideration has been given to special adaptability for summer camp purposes. The owner of the property taken is not required under such circumstances to make any pecuniary sacrifices. He is entitled to whatever the property is worth to him, or anyone else, for any purpose to which it is adapted; but the special uses or purposes to which the property is adapted must be realthat is, founded on facts capable of proofand not merely speculative or imaginary. If the owner has adopted a peculiar mode of using the land, by which he derives profit, and he is to be deprived of that use, justice requires that he be compensated for the loss to himself. It is the value which he has, and of which he is deprived, which must be made good by compensation.
* * * * * *
"Where a building is a specialty, and in a sense, unique, being constructed for a special use, the valuation cannot be predicated on the same basis as a building constructed for general or usual dwelling or commercial use. In the case of a specialty there is a limited market and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost or replacement cost may be considered. * * *"
And as stated by the same authority, § 12.1, pages 17, 18:
"* * * So long as there is an ascertainable market the market value doctrine is adhered to. * * * Where, however, character of the property is such as not to be susceptible to the application of the doctrine of market value the courts have based their awards on a so-called actual or intrinsic value." (See footnote 22, citing Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.(2d) 295; Greater Baton Rouge Port Comm. v. Watson, 224 La. 136, 68 So. (2d) 901; Housing Authority of New Orleans v. Brinkmann, 224 La. 262, 69 So. (2d) 37; Housing Authority of New Orleans v. Waters, 233 La. 259, 96 So.(2d) 560; State [Through Department of Highways] v. Barrow, 238 La. 887, 116 So. (2d) 703.) See also State of Louisiana, Through the Department of Highways v. Crockett (La.App. 2 Cir., 1963), 151 So.2d 496.
On behalf of the defendants two architects and one realtor testified from their jointly prepared estimate to the effect the reproduction cost of the entire facility would total $1,755,345.90, less the amount already deposited. These experts were of the opinion no depreciation factor was required to be deducted from this estimate because of the actual appreciation of the property values, and further because of the excellent condition of the facility due to the expenditure of $350,000 in 1954 bringing the plant up to maximum efficiency.
However, plaintiff's appraisers, after testifying to the "cost to cure" i. e., the cost to the school of expropriating or purchasing adjoining property in order to replace the footage in the playground, stated on cross-examination they had also appraised reproduction costs of the buildings plus the land for the highway department.
Mr. Carter and Mr. Tharpe, two of plaintiff's appraisers, prepared a report jointly. They testified their appraisal was based on *404 the cost to replace, square foot for square foot, the amount of land in the playground area. They further testified they did not take into account the effect of traffic volume, noise, fumes, hazards to health and hazards to safety since these items were not considered appraisal problems. However, Mr. Carter testified, on cross-examination, that in his original appraisal, relying on the comprehensive report of architect Paul Stewart, he had appraised the whole property as follows:

 Replacement cost new of classroom building ----------------- $1,178,000
 Less 50% depreciation for age and 10% depreciation for
 functional obsolescence ------------------------------------ $ 706,800
 __________
 Balance $ 471,200
 Replacement cost new of gymnasium -------------------------- $ 196,000
 Less 42.85% depreciation for age --------------------------- $ 83,986
 __________
 Balance $ 112,014
 Total land value ------------------------------------------- $ 400,000
 Salvage value of old grammar school ------------------------ $ 400
 __________
 Balance $ 400,400
 Total $ 983,614

Although it is urged by defendant the appreciation in value of the property balances the depreciation factor, we feel any award failing to make a substantial reduction in the amount awarded for these buildings because of their age and location would be an unrealistic approach to the problem. Regardless of their excellent condition because of the renovations and repairs, the intrinsic value of these structures to the owner had lessened because the buildings were not ideally located even before the expropriation. It is also inconceivable to us that the age of these buildings had not in some way depreciated their worth to the owner. The only reliable testimony upon which to base such depreciation was that of Mr. Carter and Mr. Tharpe. Although they were qualified to figure depreciation due to age of the buildings, they were not qualified to determine functional obsolescence in view of the testimony of defendant's many witnesses that the buildings had been renovated to bring them up to a high standard of efficiency. For this reason we are constrained to hold the defendant school board has suffered and is entitled to be reimbursed for severance damage in the following amounts:

 Replacement cost less 50% depreciation of classroom building -- $589,000.00
 Gymnasium less 42.85% depreciation ---------------------------- $112,000.00
 Land less amount deposited ------------------------------------ $228,400.00
 ___________
 $929,400.00
 Less estimated residual value of property for purposes other
 than a school ------------------------------------------------- $136,136.80
 ___________
 Total $793,263.20

The only testimony relative to this last item (residual value) was that of defendant's witnesses, Messrs. Land, Stubbs and Faulk, to the effect that the value of the *405 land after the taking would be $36,136.80; improvements $100,000; making a total of $136,136.80.
It is accordingly ordered the judgment of the lower court be amended so as to increase the award in favor of the Ouachita Parish School Board from $144,350.00 to $793,263.20, and as thus amended same is affirmed at plaintiff-appellee's costs.
Amended and affirmed.