No. 45,002

THE CITY OF WICHITA, KANSAS, a Municipal Corporation, *Appellant and Cross-Appellee*, v. UNIFIED SCHOOL DISTRICT No. 259 (Wichita), Sedgwick County, State of Kansas, *Appellee and Cross-Appellant.*

(439 P. 2d 162)

Opinion filed April 6, 1968.

*Everett C. Fettis,* of Wichita, argued the cause, and *John Dekker* and *Robert C. Allan,* both of Wichita, were with him on the brief for the appellant and cross-appellee.

*J. Ashford Manka,* of Wichita, argued the cause, and *Mark H. Adams, Sr., Charles E. Jones, William I. Robinson, Clifford L. Malone, Mark H. Adams II, John S. Seeber, Floyd E. Jensen, Philip L. Bowman, Robert Hall* and *Joe Rolston,* of counsel, all of Wichita, were with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

FONTRON, J.: For over forty years the Skinner School served Wichita children. For the first thirty-three winters of its existence a single sturdy two-story brick structure, containing four classrooms, graced its 4.13 acres. But in 1951 and again in 1955, the surge in school population caught up with the area served by Skinner, and in each of those years additional one-story facilities of more modern design were added.

Thus Skinner stood, until its time ran out. In the early 1960's the school found itself athwart the path of progress. The horseless carriage, multiplying in profusion, had outgrown the asphalt highways of the past and the era of the interstate system came into existence. Skinner became one of its casualties, located as it was across the route the road must take through Wichita.

Hence this lawsuit was spawned. Condemnation proceedings were commenced and appraisers were appointed by the Sedgwick County District Court to assess the school district's loss. Before entering on their duties, the appraisers were instructed on the formula they should use in measuring the value of the land condemned. The instructions will be mentioned later in more detail.

Following the court's directions, the appraisers arrived at an award of $376,588 in favor of Unified School District No. 259 (hereafter called district). Both the district and the City of Wichita

(herein referred to as city or Wichita) appealed to district court, where a trial was commenced to a jury. At the conclusion of the district's evidence the trial court directed a verdict which pleased neither litigant. The city first filed its notice of appeal, and the district has countered with a cross-appeal.

The basic dispute between the parties is over the correct method of ascertaining the amount of compensation to which the district is entitled for its property taken by the city. In brief, the district contends the proper measure of its damages, and the compensation to which it is entitled, is the cost of providing the facilities necessary to replace those which have been taken. The city, on the other hand, maintains that the district is entitled to recover either the market value of the property condemned or in the alternative the replacement cost of the facilities taken, less depreciation and obsolescence.

The appraisers were instructed in substance that tract No. 403 (being the entire 4.13 acres condemned) was exclusively devoted to and maintained as a public school facility and that the district would be required to provide and construct substitute school facilities; that property of this character is not customarily bought, sold or traded in the market place and hence has no "market value," in the ordinary sense, by which its value can be measured in eminent domain proceedings; that the city was required to pay just compensation for the land taken, but no more than necessary to indemnify the district for its loss; and that the true measure of compensation was the cost to the district of providing land and school facilities reasonably necessary to replace those it had prior to the condemnation.

The district judge before whom the appeal was tried adopted the theory on which the appraisers had been instructed. Accordingly, the district's witnesses were permitted to testify, over objection, as to the replacment cost of the school facilities taken, while the court rejected evidence proffered by the city going to the reasonable market value of the land and the replacement cost of the buildings, less physical depreciation and functional obsolescence. The court's rulings to such effect are assailed as erroneous by the city but defended as excellent by the district.

The issues raised on this appeal have not heretofore appeared before us, which possibly is not surprising since school house condemnations are doubtless somewhat rare. This court has, however, recognized that the test of market value, ordinarily used to determine

the value of property condemned for public use (2 Hatcher's Kansas Digest [Rev. Ed.] Eminent Domain, § 76; 29A C. J. S., Eminent Domain, § 136 [2], p. 545) is not always an adequate test of worth. We have held where, because of its unusual character, property has no market value in the usually accepted sense of that term, resort may be had to other means to determine the compensation due the owner for its loss. (*Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 332 P. 2d 539.)

In Eisenring this court, speaking through Mr. Justice Schroeder, said:

"The absence of market value, in the sense that there is a lack of evidence of comparable sales, does not prevent recovery by the owner in the event of condemnation. It occasionally happens that a parcel of real estate or a leasehold interest taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, he would be unable to sell it at anything like its real value. Where the usual means of ascertaining market value are lacking, or other means must from necessity of the case be resorted to, it is proper to determine the market value by considering the intrinsic value of the property, and its value to the owners for their special purposes. The owner of the property taken is not required under such circumstances to make any pecuniary sacrifices. . . ." (p. 779.)

Although the property involved in the Eisenring case was not a public school house, but a leasehold interest in a private sandpit, the undergirding principles of that decision would seem equally applicable where public property belonging to one unit of government is coveted and seized by another governmental body to be put to a different and, no doubt, superior public use. It appears to be well recognized in jurisdictions where the question has arisen, that school houses, churches, court houses and the like are special purpose properties not ordinarily bandied about in the market place, and hence a test other than market value must be employed in ascertaining their worth. Among the text writers also there is general agreement on this point.

In 4 Nichols on Eminent Domain (3rd Ed.), § 12.32, we find this discussion:

"It occasionally happens that a parcel of real estate taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, if he desired to dispose of it he would be unable to sell it at anything like its real value. A church, or a college building, or a club-house located in a town in which there was but one religious society, or college, or club, might be worth all it cost to its owners, but it would be absolutely unmarketable. . . ." (pp. 217-218.)

"Where a building is a specialty, and, in a sense, unique, being constructed for a special use, the valuation cannot be predicated on the same basis as a building constructed for general or usual dwelling or commercial use. In the case of a specialty there is a limited market and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost or replacement cost may be considered. . . ." (pp. 227-228.)

To similar effect is 1 Orgel on Valuation Under the Law of Eminent Domain (2nd Ed.) § 38:

". . . In cases dealing with the condemnation of private residences of standardized construction, for example, the courts uniformly hold that the market value standard is applicable. . . . On the other hand, the courts have often stated that property not actively traded in has no market value. But property that is not frequently bought and sold is typically property that is specially adapted to the uses to which it is devoted so that its value to the owner is likely to be much greater than its probable sale price to some other purchaser. This is particularly true with respect to properties, such as schools, churches and clubhouses, that are used for service and not for profit and the courts usually hold that properties of this type are lacking in market value. . . ." (pp. 177-178.)

A succinct statement of the rule is set out in 29A C. J. S., Eminent Domain, § 136(3), pp. 551-552:

". . . There are . . . exceptional cases where the market value cannot be the legal standard of compensation, as, for example, where the property is a specialty, and in a sense, unique, and of such nature and applied to such a special use that it cannot have a market value, such as a church, college, cemetery, or clubhouse."

Where property already devoted to a public use by one agency of government is condemned by another agency for some unrelated public purpose, we apprehend the rule generally to be that just compensation consists of paying for the cost of providing equivalent substitutes or necessary replacements for the property taken. (29A C. J. S. Eminent Domain, § 146, p. 623.) In *Town of Clarksville, Va. v. United States*, 198 F. 2d 238, the federal colossus condemned a portion of the town's sewer system, requiring the municipality to construct a sewage treatment plant and several lift stations. In holding that the cost of constructing the plant and the operation and maintenance of the lift stations (where none had been required before) were compensable items, the Circuit Court of Appeals said:

"The general principles applicable to an eminent domain taking of municipal facilities are well established. The taking may be justly compensated by payment of the cost of a substitute, so long as a full equivalent is afforded for the property taken. (Citing cases.) Of course, the interests of the public, upon which the payment burden rests, are at stake, too, and the award must

not be in excess of strict equivalence. Yet we are not here dealing with a rigid, blind measure, that grants compensation only on a pound of flesh basis, but rather with an equitable concept of justice and fairness that accords with the Fifth Amendment's mandate. Accordingly, the equivalence requirement which must be met with respect to the substitute facility is more that of utility than of mere dollar and cents value. Jefferson County v. Tennessee Valley Authority, 6 Cir., 146 F. 2d 564. And the substitute facility must be that which the claimant is legally required to construct and maintain, whether or not this type be more expensive or efficient than the facility which was condemned. (Citing authorities.)" (pp. 242, 243.)

The rule has found expression in cases where school properties have been condemned. In *United States v. Board of Education*, 253 F. 2d 760, the federal government condemned three acres of an eight acre high school campus in Ridgely, West Virginia. It was held in this case that the measure of the school district's damage was the cost of replacing the land it had lost so the school could be continued in operation on the same basis as before. In its opinion, the appellate court upheld an instruction in which the jurors were told they had the right to determine "a just compensation for the damages suffered by the defendant in restoring itself to the full utilitarian and the equivalent use [of its lands] enjoyed before the taking by the government."

A like situation obtained in *State v. Waco Independent School District*, 364 S. W. 2d 263 (Tex.), where the grand state of Texas took some 7.4 acres of the 25 acre campus of University High School, in Waco. The court held the proper measure of compensation to be the amount necessary to restore the acreage and facilities which remained to the same or reasonably equal utility for high school purposes as that possessed by the original 25 acres and facilities prior to the taking.

The same method of computing compensation was applied in *United States v. Certain Land In City Of Red Bluff, Etc.*, 192 F. Supp. 725, where the federal government took unto itself a municipal parking lot. In the private sector as well as the public sector, the rule of equivalent replacement has been applied where evidence of fair market value was missing. In *United States v. 531.13 Acres Of Land, Etc.*, 244 F. Supp. 895, flowage rights were involved, and it was said the landowner's damage was the cost of substitute facilities and costs of maintenance for a reasonable length of time. The replacement value of a golf course has been held to be the proper measure of compensation. (*Albany Country Club v. State*, 241 N. Y. S. 2d 604, 19 A. D. 2d 199.)

The city concedes that in the ordinary sense there is no true market value for school buildings, inasmuch as they are not commonly bought and sold on the open market, but argues that replacement cost must be subjected to depreciation and obsolescence. The only authority cited which supports this contention is *State, Dept. of Highways v. Ouachita Parish Sch. Bd.*, 162 So. 2d 397 (La.), where the court held that the proper measure of damages for taking a school facility included the replacement cost of the buildings, less depreciation. The court further indicated that functional obsolescence would be a proper factor to consider if evidence of obsolescence were present.

In our judgment the Louisiana case represents neither the main weight of authority nor the best reasoned view, even though we recognize its rationale is not wholly bereft of reason. The status of a school district deprived by condemnation of its property differs radically from that of a private condemnee. A school district exists to further the educational process, and when its school property has been condemned, it may not take its money and liquidate its operations. The district remains charged with the same public duty of providing educational facilities for its children as it had before its property was taken. And the cost of constructing substitute facilities is equally great whether those condemned were new or ancient.

We believe the cases generally hold that where a public body sustains the loss of a facility essential to the performance of its public function, it is entitled to receive such compensation as will put it in as good a position pecuniarily as if its property had not been taken. (*Mayor And Council Of Baltimore v. United States*, 147 F. 2d 786.) In *United States v. State of Arkansas*, 164 F. 2d 943, the court put it this way:

".  .  . The fundamental principle is that the public authority charged with furnishing and maintaining the public way, whether it be a highway, a street or a bridge, must be awarded the 'actual money loss which will be occasioned by the condemnation  *  *  *' This amount is usually the cost of furnishing and constructing substitute roads.  .  .  ." (p. 944.)

This principle contemplates that replacement costs are not to be diminished by deductions for depreciation or obsolescence. In *City of Fort Worth, Tex. v. United States*, 188 F. 2d 217, where the taking of city streets was involved, the court stated:

".  .  . The cost of adequate substitute facilities to be so computed, is proper *whether such sum be more or less than the value of the street and*

*facilities taken.* U. S. v. Los Angeles County, *supra.* We think the true rule in such cases is well stated in Jefferson County v. Tennessee Valley Authority, *supra*, 146 F. 2d 564, 565, that the practical view is to consider the road and highway needs of the civil division affected by the taking and to allow the governmental unit such sum in damages *as will pay the cost of road facilities equal  *  *  *  to those destroyed.  .  .  .*" (Emphasis supplied.) (p. 223.)

As previously pointed out, this principle was enforced in *Town of Clarksville, Va. v. United States,* supra, with respect to the taking of sewage facilities, the court stating that the substitute facility "must be that which claimant is legally required to construct and maintain, whether or not this type *be more expensive or efficient than the facility which was condemned.*" (Emphasis supplied.) (p. 243.) See, also, for a definitive statement of the rule, 29A C. J. S., Eminent Domain, § 146, pp. 623-624.

In our view the trial court adopted the proper standard for ascertaining the compensation due the district for the buildings taken by the city. That one of the buildings was erected in 1918 furnishes no basis for voiding the rule. In the perspective of history, its life must be considered rather brief. At any rate, when the end finally came, the stalwart old structure was still performing its function as a hall of learning, without suggestion of debility.

The parties stipulated, for purposes of the trial only, that the cost of replacing the buildings was $307,184. Accordingly it was not error for the court to direct a verdict as to this phase of the district's damage. However, the court also directed a verdict with respect to the compensation due for the taking of the land (4.13 acres), and the district alleges this to be error.

For a reader to understand the court's theory in so doing, as well as the district's claim of error, additional facts must be supplied. When Skinner was closed, which appears to have been in 1964, no additional land was purchased, but the children were divided among three nearby schools. Between 185 and 190 were sent to Mueller, from 125 to 135 went to Isely and approximately 70 were absorbed at L'Ouverture.

At Mueller, eight additional classrooms had already been constructed on the existing school site in anticipation of an influx of Skinner pupils. At Isely, temporary portable classrooms were provided to accommodate its quota of Skinner's displaced pupils, while at L'Ouverture the existing facilities apparently were adequate, for the time being, to house the 70 pupils transferred there.

When this case was tried, plans were underway for acquiring

additional land at Isely and for erecting additional facilities to care for the former Skinner children. The situation at L'Ouverture at time of trial is not revealed by the record.

With the foregoing facts in evidence the trial court took the view that the only land costs required to place the district in a position equivalent to that which it occupied prior to the condemnation, was such amount as was needed to secure the additional acreage for Isely. This amount the court considered to be $14,530 on the basis of a trade of land previously engineered between the School Board and the Park Board, the facts concerning which were stipulated. This sum was added to the stipulated cost of building replacement and to the admitted cost of $8100 for moving playground equipment, and the court directed a verdict in favor of the district for the resulting total, which came to $329,814.

The district is now, and was at the time, unhappy with the verdict. When it learned that the court proposed to limit its recovery for land replacement to the amount expended in enlarging the Isely site, the district immediately requested leave to reopen its case "and go additionally into the temporary situation that this land acquisition is still not complete." The court denied the request except as to the cost of the Isely land and this denial is included among the city's statement of points. It may not be amiss to note that the city complains of that part of the order which permitted the district to reopen its case to show the additional land cost at Isely. Thus both parties stand aggrieved.

The granting of a litigant's motion to reopen its case lies largely within the sound discretion of the trial court and its determination will not be disturbed in the absence of a showing of abuse of discretion. (*Doonan v. Crossland,* 181 Kan. 372, 374, 311 P. 2d 1011.) The city has shown no such abuse on the court's part in permitting the district to open its case in part and its claim of error in such regard is without merit. A more valid case, however, is presented by the district's claim of error.

The prevailing rule, which entitles a public condemnee to compensation for property taken in such an amount as will be sufficient to provide needed equivalents, is equally as applicable to lands as it is to buildings. The equal application of this rule to lands and structures, alike, was inherent in the instructions given the court-appointed appraisers. Indeed, we believe the trial court itself tacitly recognized the rule's applicability to necessary land replace-

ment when it permitted the district to reopen its case for the purpose of showing the cost of the area added to Isely.

Where the court went astray was in the restricted view it took of what is comprehended in the terms "necessary replacement" or "equivalent facilities." This area was probed in some depth in *City of Fort Worth, Tex. v. United States,* supra, an action arising out of the condemnation of portions of certain streets within the city. In holding that the government was obligated "to furnish substitute facilities which would leave the City's traffic system as ample and as near of equivalent sufficiency as reasonably practical, to that which would have existed" had the streets not been closed, the court said:

". . . The true test is not whether the substitute facilities already in existence will carry the traffic, diverted and nondiverted, but rather what compensation is necessary to enable the City to provide a facility which will carry the entire traffic load in an equally adequate manner as would have been true had there been no condemnation. . . . What we hold is that the City is entitled to an award sufficient to provide such traffic facilities as are necessary to restore its entire adjacent system of such facilities to the same status of utility as was enjoyed prior to the taking. In this determination nearby facilities are entitled to no weight other than such as may be proper to determine the extent to which their presence would withdraw traffic from the condemned highway even if it was still in use, or to the extent that by improvement or betterment they might properly be made to provide adequate substitute facilities." (pp. 221, 222.)

In directing the verdict that it did, the trial court, in effect, ruled that the tract added to Isely was the only land required to restore the district's facilities to the status of utility enjoyed prior to the condemnation. Implicit in this ruling was the court's determination, as a matter of law, that both Mueller and L'Ouverture schools were capable, without additional land expense, of caring for their share of the children from Skinner without diminishing or impairing the district's over-all capacity to provide educational facilities for its youngsters.

In the absence of stipulation, we believe the amount of compensation, if any, reasonably needed by the district to provide equivalent substitutes for the land condemned, presented a question for the jury to determine. (*State v. Waco Independent School District,* supra.) Substitute facilities need not duplicate those which are taken, if they be of equivalent utility, and where no replacement is required to restore a public agency to its prior state of efficiency in discharging its public functions, nominal damages only are

justified. (*Town of Clarksville, Va. v. United States,* supra; 29A C. J. S., Eminent Domain, § 146, supra.) However, what, if anything, may be the reasonable cost of *furnishing necessary* replacements constitutes a factual question.

The district takes a somewhat inconsistent stance in claiming compensation for its land. On pages 41 and 42 of its brief we read:

"The value of the 4.13 acres of school lands condemned by the plaintiff was shown by substantial and competent evidence to be from $71,961 to $123,000. (R. 17, 19, 44-45, 90-91.) And, the proffered testimony by the appellant city valued this land at $41,950 and $54,063."

The district thus assumes, as did the witnesses who expressed their estimates of land value, the necessity of replacing the 4.13 acres of land taken with another entire 4.13 acres. This is an assumption concerning which there may be some doubt in view of the fact that a suitable structure for housing some 185 or 190 of Skinner's pupils has already been erected on existing school land at Mueller at slight additional land expense. The correct measure of compensation is the cost providing *necessary* replacements or *equivalent* substitutes.

In denying the district's motion to reopen its case, except as to land cost at Isely, the trial court foreclosed the district of an opportunity to show what, if any, expense incurred at Mueller for items such as landfill, retaining walls, fences, guarantees, etc., can be attributed to land replacement costs, as well as what effect the absorption of 70 pupils by L'Ouverture school would have on the district's over-all land requirements. As to the situation at L'Ouverture, it should be made clear that while the city is under no obligation to assist in providing new educational facilities to meet the challenge of future growth, it *is* required to compensate the district in such amount that the status quo at the time of taking will be preserved so far as the district's pupil capacity is concerned.

We conclude the trial court erred in taking from the jury the question of what compensation was due the district for the taking of its school site and in directing a verdict in such respect. We are of the opinion also that under the circumstances shown of record, the court erred in overruling the district's motion to reopen its case.

One further point needs to be mentioned. The district complains that the court excluded the Marshall-Stevens Construction Cost Index and testimony based thereon. This publication is a national report giving average replacement building costs in given areas,

arrived at by the use of an average replacement factor applied to original construction costs.

It is argued that the Index falls within the definition of a "learned treatise" and is thus admissible under the exception to the hearsay rule set forth in K. S. A. 60-460 (*cc*). While it may be that the Index will fit within the learned treatise category, although the evidence in this regard permits some doubt, it is unnecessary for us to determine that question here.

The witness who identified the Index testified positively and in detail as to construction costs in Wichita, and what it would cost to replace the school buildings in Wichita. In view of the witness' specific testimony, what the average construction costs might be generally or in other areas would be immaterial. The question in issue was not what replacement costs might be somewhere else, or what average construction costs might be; but what the cost of replacing the buildings would be in the city of Wichita.

Furthermore the question became moot when the district stipulated as to the cost of replacement. No error is discerned in the court's exclusion of the proffered evidence.

The judgment of the court below is reversed and the case is remanded with instructions to grant a new trial in accordance with the views herein expressed.