CITY OF TULSA, Oklahoma, a Municipal Corporation, Appellant,

v.

MINGO SCHOOL DISTRICT NO. 16 and John F. Cantrell, County Treasurer of the County of Tulsa, State of Oklahoma, Appellees.

No. 48082.

Court of Appeals of Oklahoma, Division No. 1.

April 20, 1976.

Rehearing Denied May 25, 1976.

Certiorari Denied Jan. 17, 1977.

Released for Publication by Order of Court of Appeals Jan. 20, 1977.

Waldo F. Bales, City Atty., by David Nelson, Asst. City Atty., Tulsa, for appellant.

Harold Charney, Owasso, for appellees.

BOX, Judge.

An appeal by the City of Tulsa, plaintiff-condemnor in an eminent domain proceeding, from an order overruling City's motion for a new trial, subsequent to the entry of judgment on a jury awarded verdict in the amount of $100,000 in favor of Mingo School District No. 16.

At issue is the proper measure of severance damages in the condemnation of a small strip of school district property upon which a functioning elementary school is located. The condemning authority, the

City of Tulsa, urges that the usual "before and after" market value test is the only permissible measure of damages. The condemnee, Mingo School District No. 16, argues to the contrary that the cost of restoring the utility to the remaining land, and the educational facility located thereon, is under the circumstances the proper measure of just compensation.

## I

The Mingo Elementary School is located at the Southwest corner of Mingo Road and Forty-Sixth Street North in Tulsa County, Oklahoma. Forty-Sixth Street was originally a lightly-traveled two lane road running east and west on the north side of the school property, but the Tulsa County Major Street and Highway Plan called for its expansion into a four lane highway of considerable importance to the metropolitan area traffic flow. A small portion of the Mingo School's eight acres laid directly in the path of the contemplated expansion, and in 1972 the City of Tulsa instituted condemnation proceedings to clear the way for construction. A strip of land on the west side of the school, running 56 feet by 471 feet and constituting approximately six-tenths of an acre was taken.

Prior to the taking, the school building itself was about 67 feet from the curb line of Forty-Sixth Street. The condemnation had the effect of placing the north side of the building within 37 feet of the newly widened highway.

After the commissioners had assessed the amount of damages at $4,100, the District demanded a jury trial. The District's primary objection to the commissioners' report was not that the value of the land taken was under-appraised but that it was also entitled to recover severance damages to compensate it for the cost of restoring the school to a usable facility. It contended that increased traffic noise which would emanate from a widened Forty-Sixth Street would be so disruptive and annoying to the educational process that the classrooms on the north and east part of the building would be rendered completely useless. The

only way to restore the utility thus lost, contended the District, is to soundproof and air-condition the building. Accordingly, it sought to recover these expenses.

At trial, the District devoted little effort to making the usual showing of the diminution in market value caused by the partial taking. Instead it attempted to demonstrate the pervasive impact of the enhanced traffic noise on the Mingo School and to show the kind of alterations that would be necessary to abate the increased noise level in the classroom.

Mr. Rose, an acoustical engineer, testified that based on the estimates of the Oklahoma Division of Highways, 6,000 vehicles per day would be traveling on the widened Forty-Sixth Street, within about 37 feet of the school. This figure is projected to increase gradually over the years so that by 1990, 17,000 vehicles will travel the highway daily.

The sheer volume of vehicles expected to travel Forty-Sixth Street daily, in light of its proximity to the school building suggests that the Mingo School will experience a serious noise pollution problem. But according to Mr. Rose's testimony the impact on the sound pressure level in the classroom cannot be appreciated merely by the number of vehicles projected to travel the highway. The type of vehicles concerned is also an important factor in determining the degree of noise disturbance. Some vehicles are more noisy than others. Trucks, he stated, emit far more noise than ordinary passenger cars and because a relatively high percentage of Forty-Sixth Street traffic will be composed of trucks, the traffic noise will be greater than the volume of traffic alone would indicate. In addition, Mr. Rose maintained, the traffic noise will be particularly vexatious near the Mingo School because a traffic signal will be erected at the intersection of Forty-Sixth Street and Mingo Road and passing trucks will consequently be accelerating, decelerating and shifting gears as they traveled by the school.

Mr. Rose's conclusion, in light of these facts, was that the noise level in the class-

room will experience a marked increase of six decibels, or 50 percent. Mr. Rose's opinion with respect to the net effect on the learning process was that

". . . the expansion of the road system and its proximity to the school would render the school insufficient or inadequate for normal educational processes, in other words, when the teacher spoke the children could not hear because of the noise from the traffic so close outside."

Mr. Rose was also of the opinion that there was little that the District could do to abate the noise, without soundproofing and air conditioning the building. Even with the windows closed, which would be nearly impossible to tolerate in times of warmer weather, the noise level would remain at such an intense rate that effective teaching would be severely impaired.

Dr. Merrill, an audiologist and Director of the Department of Communicative Disorders at the University of Tulsa underscored much of Mr. Rose's testimony regarding the effect of the increased traffic noise. Dr. Merrill testified that the sound pressure levels created by the traffic noise from a widened Forty-Sixth Street would be so high as to be "inimicable to the educational process." He also stated that the traffic noise will be particularly annoying and fatiguing to elementary school students.

The principal of the Mingo School, Mr. Snodgrass, testified that the construction noise and noise from passing gravel trucks occasioned by the widening of Forty-Sixth Street was already making it difficult to teach. He was concerned that once the highway is completed and in use, effective teaching in the class rooms on the north and east side of the building would come to a halt. Mr. Snodgrass also stated that the school could not continue to operate effectively if it lost the use of these class rooms.

The testimony of Mr. Pratt, a traffic engineer and transportation planner, dealt with the role of the widened Forty-Sixth Street in the metropolitan traffic flow and its impact on the school. Mr. Pratt ruled out any notion that the classroom noise level would be significantly affected by traffic noise from the Mingo Road, which intersects with Forty-Sixth Street near the school. According to Mr. Pratt's testimony, the traffic on Mingo Road is relatively light and is primarily composed of local automobiles traveling to and from work.

Forty-Sixth Street, on the other hand, is designated to serve as an important thoroughfare in the regional traffic system. Consequently, at least ten percent of the vehicles traveling the highway will be trucks, which by Mr. Pratt's estimate, will pass by the school intermittently throughout the day. Mr. Pratt stated that as a highway planner he would be quite concerned with the environmental impact of the highway on the school because "[T]he road is quite close to the school, its definitely planned as part of the regional system that's going to carry truck traffic from other arterials and from expressways over to the Port of Catoosa and other industrial activity and so the noise would definitely be a major concern." The only feasible solution to the noise problem, Mr. Pratt concluded, was to soundproof both the north and east sides of the building.

Mr. Butcher, an architect, provided most of the District's evidence of the specific alterations required to abate the increased noise level in the classrooms. Mr. Butcher testified that he had designed a soundproofing plan for the Mingo School, based on the findings and recommendations of Mr. Rose. Mr. Butcher's plan consisted of sealing the windows on the north side of the building with brick, using special acoustical sealed glass windows on the east side and then— because sealing these windows would eliminate the school's source of ventilation—installing an air conditioning system. Mr. Butcher testified, over the City's vigorous objections, that the cost of the proposed alterations would be $93,325.00.

The District's only witness on the issue of the loss in market value of the remaining land was Mr. Morris, a Tulsa real estate broker. Mr. Morris testified that the "highest and best use" of the Mingo School property was as a public school and that it was of little value for any other purpose. Mr.

Morris attempted to arrive at an estimate of the market value of the land but his appraisal was based on the value of the land as of the time of trial rather than the time of taking. As a consequence, he was forced at trial to back date his estimate by some two years in order to arrive at an acceptable measure of value, which resulted in some confusing, and somewhat questionable valuations.

As we understand the record, the value of the entire tract of land at the time of taking was, according to Mr. Morris' estimation, approximately $400,000.00 and the value of the remaining land after the taking was about $125,150.00—which represents a diminution in value of $275,530. Mr. Morris accounted for this radical depreciation in value on the ground that the taking would deprive the school property of its only significant use—as a public school. He maintained that the only plausible alternative use of the property would be as an industrial warehouse or storage place of some kind, and that it would be of little value even for this limited purpose.

The City produced three witnesses in defense of its contention that the District was entitled to no severance damages: A traffic engineer; the land acquisition agent for the City; and an appraiser. The traffic engineer disputed much of the District's testimony regarding the impact of the increased traffic noise. It was his opinion that Forty-Sixth Street, once it has been completed, will remain essentially a lightly traveled, inter-local traffic thoroughfare and would create no more noise than any other highway in the Tulsa area. The Tulsa land acquisition agent provided photographs of many of the Tulsa metropolitan area schools which are also situated adjacent to busy highways, many of which have a higher traffic flow count than that projected for Forty-Sixth Street.

Mr. Johnson, the appraiser who testified on behalf of the City, stated that the remaining portions of the Mingo School property had sustained no appreciable damage as the result of the taking and that it could still be used as an elementary school. Mr.

Johnson also observed that school property is ordinarily considered special purpose property not commonly traded in the open market and not having a market value in the ordinary sense of the term. Nevertheless, he arrived at a market value measurement of the District's loss: $46,588 before the taking and $42,407 after the taking. This estimate was based exclusively on the loss in value of the portion of the property taken and did not take into consideration any loss in value of the remaining portion of the property.

The jury returned a verdict in favor of the District, awarding $100,000 in damages. The City has appealed from an order overruling its motion for a new trial, and asserts numerous grounds for reversal. Two inter-related questions are raised by its appeal: whether the trial court erred in allowing expert testimony with respect to the effect of the traffic noise and the expenses necessary to reduce its impact on the classroom; and whether the trial court's instruction on the measure of severance damages, which appears to permit the jury to award the cost of restoring the school to its original condition, was erroneous.

II

We turn to consider first whether the evidence with respect to the increase of traffic noise and its detrimental effect on the Mingo School was permissible. When part of a tract of land is taken by eminent domain the just compensation to which the owner is entitled includes the damages to the remainder of the tract attributable to the taking as well as the value of the land taken. E. g. *Finley v. Bd. of County Commissioners*, Okl., 291 P.2d 333. The damage to the remainder area has traditionally been measured by the depreciation in value resulting from the taking, which is computed by determining the difference between the value of the entire tract before the taking and the value of the remainder area afterwards. E. g. *McInturff v. Okla. Natural Gas Transmission Co.*, Okl., 475 P.2d 160. In ascertaining these damages, it is proper for the jury to consider every element

which a purchaser willing but not obliged to buy would consider, and the condemnee is entitled to prove the specific elements which contribute to the depreciation in the market value. *Driver v. Okla. Turnpike Authority,* Okl., 343 P.2d 1079. It has thus been held that a jury may consider even the "inconvenience and annoyance likely to arise in the orderly exercise or conduct of the enterprise which interferes with the use and proper enjoyment of the property by the owner." *McInturff v. Okla. Natural Gas Transmission Co.,* supra at syllabus 1. See also *St. Louis R. Co. v. Matthews,* 174 Okl. 167, 49 P.2d 752; *Muskogee v. Hancock,* 58 Okl. 1, 158 P. 622.

We can think of no reason why the effect of increased traffic noise caused by a partial taking should not be considered a factor affecting the value of the remaining land and therefore an element of damage to be considered by the jury. As one judge has noted "[N]aturally, market value will reflect the effect of noise, vibration, dust, odors, etc.; and insofar as severance damages are concerned, they are factors which are bound to have an influence on what a willing buyer will pay." *State Road Comm'n v. Rohan,* 26 Utah 2d 202, 487 P.2d 857, 860 (Ellett, J. concurring). The majority of courts which have considered the question have embraced this rationale and have upheld judgments for severance damages where the jury considered the effect of increased traffic noise in arriving at the amount of damages. 4A Nichols on Eminent Domain § 14.2462 (Rev. 3d ed. 1975); Annot., 51 A.L.R.3d 860. See generally Hildebrand, *Noise Pollution: An Introduction To The Problem and an Outline For Future Legal Research,* 70 Colum.L.Rev. 652 (1970).

We think it was proper, then, for the trial court to allow the District to present evidence of the disturbing effect of the increased traffic noise, and for this reason we also find no merit to the City's argument that the District's witnesses testifying on the issue were incompetent because they were not familiar with the market value of the land. The City seems almost to concede this point. By implication, at least, it appears to agree that evidence of this sort ought to be admissible for the purpose of proving the depreciation in market value of the remaining portion of a condemnee's property. The City's chief complaint centers around the fact that the District's expert witnesses were also allowed to testify in detail regarding the specific measures required to abate the noise (soundproofing and air conditioning the building) and the estimated expenses entailed. The City argues that such evidence is highly irrelevant and prejudicial. We turn next to consider this issue.

### III

Essentially, the question whether the District could present evidence of the specific costs of restoring the utility of the land lost as a result of the partial taking. The City places much reliance on *State v. Levick,* Okl., 365 P.2d 141, and we agree that this decision casts grave doubt on the propriety of admitting such evidence in a partial condemnation action. In *Levick* the Highway Department had instituted condemnation proceedings to obtain, among other things, an easement on a parcel of land for temporary use as a "borrow pit." The condemnee was permitted to testify as to the amount required to restore the land to its original utility. The Supreme Court reversed a judgment in favor of the condemnee, concluding that the "cost of the replacement of the dirt and gravel is not the measure of damages, and such evidence should not have been permitted." The court felt that the before and after market value role was the only appropriate standard for determining the condemnee's damages and that consequently evidence of restoration cost was inadmissible.

The City argues that the *Levick* case compels a similar result here. To hold otherwise, it contends, is to permit the effect of increased noise to be considered a separate and distinct element of the condemnee's severance damages. We agree that the principles of *Levick* stand as a barrier to evidence of the cost of restoring the remaining land in most cases. We

agree too, that the courts have generally rejected attempts to make noise a separate and distinct element of severance damages. See Annot., supra. Nevertheless we think that under the peculiar circumstances of this case, the evidence of the costs to restore the utility of the Mingo School was quite properly admissible.

The factor which justifies, indeed compels, the use of such evidence in the instant case is the inapplicability of the traditional market value measure of severance damages. Market value has of course long stood as an imminently practical standard of valuing property and the courts have understandably been reluctant to depart from its use. See *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). But most courts which have dealt with the problem have recognized that in some special cases the market value test is both an inadequate and unfair measure of severance damages. See 4 Nichols, supra, § 12.32. The pre-eminent example of such a case is that of the special purpose property owner—the owner of property which, because of its peculiar characteristics or uses, simply has no market value. See, e. g., *United States v. Miller,* supra; 4 Nichols, supra, § 12.32; Comment, *Just Compensation and the Public Condemnee,* 75 Yale L.J. 1053 (1966). Publicly owned property used for public purposes—parks, highways, public utilities, schools and the like—are common examples.

In measuring the value of such property the hypothetical buyer-seller concept of market value simply fails as a meaningful standard for determining just compensation. Because of its unique nature, such property is rarely sold in the open market. As Justice Fontron, speaking for the Supreme Court of Kansas, has noted in an often quoted phrase, special purpose property is ". . . not ordinarily bandied about in the market place." *City of Wichita v. Unified School Dist. No. 259,* 201 Kan. 110, 439 P.2d 162, 166. See also 4 Nichols, supra, § 12.32; Level, *Evaluation of Special Purpose Properties in Condemnation Proceedings,* 3 Urb.Law 428 (1971).

The City does not seriously dispute the fact that the concept of market value is essentially useless in determining the District's just indemnity. Indeed, its own expert witness, Mr. Johnson, stated unequivocally that the Mingo School property had no market value in the usual sense of the term. Counsel for the City said much the same thing in objecting to the testimony of the District's appraiser. Yet the City now urges on appeal that the only proper way to measure the District's severance damages is to apply the customary before and after market value rule. The City thus chooses to ignore its contradictory stance and argues in favor of a concededly deficient measure of compensation. We think the City's position is manifestly untenable and demonstrates clearly the need for an alternative measure of compensation.

The courts in the majority of jurisdictions which have dealt with this problem have responded to the need for a substitute to the usual market value approach to compensation by adopting special rules for both the measure of compensation and the evidence admissible in condemnation proceedings involving special purpose property. See 4 Nichols, supra, § 12.32; I. L. Orgel, Valuation Under the Law of Eminent Domain § 42 (2d ed. 1953); Level, supra; Comment, supra; Note, 6 Seton Hall L.Rev. 711 (1975). We turn to consider whether the *Levick* case and other authority uniformly applying the market value rule and excluding evidence at variance therewith, prohibit a similar approach in the instant case.

The basis for excluding evidence of restoration costs in *Levick* was that the market value approach was the appropriate measure of compensation under the facts. The court did not state that such evidence will be inadmissible in all cases and it seems, at least when the market value approach to determining just compensation has no meaningful application to the facts of the case, that evidence of restoration or replacement costs might well be admissible for the purpose of proving severance damages under an alternative method of valuation.

Similarly, the Oklahoma Supreme Court has never held that the exclusive method in all cases for determining severance damages is the before and after market value rule. And we have found no authority which indicates that some alternative approach could not be adopted when, as in the case of special purpose property, the traditional approach to arriving at just compensation wholly fails to fulfill its purpose. Indeed, it is doubtful that such a rule would be constitutionally permissible when applied to property with no practical market value.

■ Market value is simply a practical standard adopted to provide the owner with his constitutionally guaranteed indemnity; it is not an end in itself. *United States v. Miller,* supra. Moreover, it seems clear that the Constitution may require alternative means of indemnity where the market value standard proves inadequate. *United States v. Fuller,* 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16; *United States v. Miller,* supra; *City of Wichita v. Unified School Dist. No. 259,* supra. See also 4 Nichols, supra, § 12.1(4); Level, supra. The United States Supreme Court has thus stated that it "has refused to make a fetish . . . of market value, since it may not be the best measure of value in some cases." *United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392. See also *J. A. Tobin Const. Co. v. United States,* 343 F.2d 422 (10th Cir.); Day, *Problems in Condemnation of Property Devoted to Public Use,* 44 Tex.L.Rev. 1517, 1526–27 (1966). It must be remembered that the purpose of any condemnation value rule is simply to put the owner "in as good (a) position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* supra, 317 U.S. at 373, 63 S.Ct. at 279.

But assuming that some alternative to the market value approach was necessary in the instant case, was the trial court correct in admitting evidence of restoration costs? Essentially the trial court was applying the flexable "substitute facilities doctrine," which has recently seen widespread application when publicly owned special purpose properties are the subject of a condemnation proceeding. See 4 Nichols, supra, § 12.32; Level, supra; Comment, supra; Note, supra.

■ Under the substitute facilities doctrine the condemnor may be obliged to furnish a replacement that will provide a functional equivalent to the condemned property or to pay for the cost of necessary restoration of the utility lost. The doctrine requires the trier of fact to focus not on the depreciation in market value but on the cost of equivalent facilities or necessary measures to restore the utility to the property.

In *City of Wichita v. Unified School Dist. No. 259,* supra, for instance, a forty-year-old school building was taken for the construction of a highway. The Supreme Court of Kansas held that the school district was entitled to the cost of a substitute which would be of equal utility for that which was taken. See also *City of San Antonio v. Congregation of the Sisters of Charity,* 404 S.W.2d 333 (Tex.Civ.App.); *State v. Waco Independent School Dist.,* 364 S.W.2d 263 (Tex.Civ.App.).

*City of Wichita* involves a total condemnation, which is not the case here. But the same principle was applied in *State Highway Com. v. Bd. of Ed. of Elizabeth,* 116 N.J.Super. 305, 282 A.2d 71; a decision factually similar to the instant case. In *Elizabeth* the Supreme Court of New Jersey ruled that the before and after market value rule would not adequately compensate a school board for the loss in utility of an elementary school brought about by a partial taking and the subsequent construction of a major highway adjacent to the school. Accordingly, the court held that the school board was entitled to recover the expenses necessary "[to] restore the overall capacity of the system to the same state of readiness and utility as it possessed prior to the taking." The court stated its view of the doctrine as follows:

"Where property already devoted to a public use by one agency of government is partially taken in condemnation by another agency for some unrelated public purpose, the rule is that just compensa-

tion should be paid for damages to the remainder which will put it in as good a position as if there were not partial taking . . . in order to restore the public agency to its prior state of efficiency in discharging its public functions. . . . Therefore, under such circumstances damages proved are not to be diminished by deductions for depreciation and obsolescence."

The *Elizabeth* court accordingly held that the District was entitled to recover the cost of installing a soundproofing and air conditioning system, the cost of landscaping and architectural fees. The Court of Appeals of Kentucky has recently upheld a similar award of damages in *Bd. of Ed. of Louisville v. Dept. of Hwys.*, 528 S.W.2d 657. The court held that a school board condemnee was entitled to recover the cost of restoring the school property to its former condition, as measured by the expenses necessary to acquire adjacent land for a new playground area, the cost of soundproofing and air conditioning the building so as to eliminate the traffic noise from an expressway, and architectural fees.

■ We conclude that the substitute facility doctrine is the most appropriate method of measuring just compensation for the partial taking of the Mingo School property. Accordingly the District was entitled to recover all reasonable expenses necessary to restore the building to its former condition of usefulness, including the cost of soundproofing and air conditioning. The evidence of the costs of restoration was therefore admissible.

### IV

■ Since the District was entitled to recover its restoration costs the trial court's instruction to the jury was not erroneous. As we have noted, the instruction seems to allow the jury to consider the restoration cost in arriving at an estimate of the depreciation in market value. Specifically, the instruction provides:

### "INSTRUCTION NO. 3.

"You are instructed that the measure of damages in this case is the difference between the fair market value of the whole property immediately before the taking and the fair market value of the portion of the property left immediately after the taking.

"You are further instructed that in considering defendant's damages under the measure of damages set out above you may consider items necessary to repair the property in order to re-establish its usefulness, if any, in coming to your conclusion as to the depreciation in fair market value, if any, you may find."

We think the appropriate instruction in this case would have been to instruct the jury that it should award the reasonable cost, if any, necessitated by the partial taking, required to restore the property to its former condition of usefulness as a school. See e. g., *Commonwealth v. City of Winchester,* 431 S.W.2d 707 (Ky.). We find no error in the instruction given, however, because it is clear from the record that the jury awarded the cost of restoration and that the award as given was well within the evidence.

Finally, we note that there are other errors alleged by the City but we feel in light of what has already been said that they are without merit and need not be discussed.

AFFIRMED.

ROMANG, J., concurs.