**Ralph LUNDGREN et al.**

v.

**PAWTUCKET FIREFIGHTERS ASSOCIATION LOCAL NO. 1261 et al.**

**No. 89–405–Appeal.**

Supreme Court of Rhode Island.

July 31, 1991.

Lauren E. Jones, Robert S. Thuurston, Jones Associates, Michael F. Horan, Pawtucket, for plaintiffs.

Richard Skolnik, Intern. Ass'n of Firefighters, Providence, Thomas Woodley, Intern. Ass'n of Firefighters, Washington, D.C., Harry J. Hoopis and John P. Hawkins, Pawtuckett Firefighters, Providence, for defendants.

## OPINION

KELLEHER, Justice.

This controversy comes before us on appeals taken by the defendants following a Superior Court jury trial. The defendants are members of the Pawtucket Firefighters Association Local No. 1261 (local 1261) and the International Association of Firefighters (IAFF or International). The five plaintiffs at the trial and the appellees before us are Ralph Lundgren (Lundgren), Joseph Scully (Scully), Raymond Murray (Murray), Frank Sylvester (Sylvester), and Florent Gendreau (Gendreau).

The record indicated that the five plaintiffs were employed by the city of Pawtucket as firefighters. Four of the five, Lundgren, Scully, Murray and Gendreau, were battalion chiefs. All plaintiffs have since retired from the Pawtucket Fire Department. During their years of service, plaintiffs were members of both local 1261 and IAFF.

Difficulties for plaintiffs apparently began in February 1980. At that time William McGill, the president of local 1261, sent letters to the department's battalion chiefs (including some of plaintiffs). In his letters William McGill demanded that the battalion chiefs resign from the union and threatened the chiefs with expulsion from IAFF if they refused to comply. It appears that the battalion chiefs were being forced out of local 1261 "because they were members of management."

Later, in the spring of 1980, the city of Pawtucket scheduled promotional examinations for firefighters. Local 1261 held two meetings in which the forthcoming examinations were discussed. In violation of International's constitution and bylaws, members had not been notified of the meeting in writing at least seven days in advance. However, notices of the meetings had been posted on various bulletin boards. William McGill testified that the meetings were held on such short notice that it was impossible to abide by the mandate of IAFF's constitution.

A majority of those present at the meetings voted to boycott the promotional examinations. The issue of establishing a picket line was never made subject to a vote. On the day of the examinations, however, members of local 1261 set up a "spontaneous" picket line outside the examination site. The plaintiffs crossed the line and participated in the examinations. At trial William McGill conceded that pursuant to the terms of the collective-bargaining agreement, plaintiffs had the right to take the examinations.

In late July 1980 William McGill filed internal union charges against plaintiffs for violating local 1261's policy. The charges against plaintiffs included "[f]ailure to abide by the [union] resolution passed * * * and crossing the picket line." Although the union's constitution and bylaws require a trial within forty-five days, this deadline was not met; instead, the charges were dropped and reinstated in a subsequent notice. This duplicative action came about because the trial-board members had to be selected from among the membership of a neighboring local union since all members of local 1261 were involved in the incidents that led to the charges.

William McGill then contacted IAFF vice president Martin J. Pierce (Pierce). Wil-

liam McGill informed Pierce that an impartial trial board could not be formed from the members of local 1261. In such a situation, International's constitution and bylaws provided that the vice president is to submit the names of seven members of a neighboring IAFF local affiliate to the "accused," and then the "accused" shall select three of the seven listed persons to serve as the trial board.

Following these procedures, Pierce sent a letter to plaintiffs. The letter listed seven members of an IAFF local in nearby East Providence. Each plaintiff was to select three names from the seven suggested. If plaintiffs did not make a selection, then Pierce would appoint the triumvirate. Sylvester, acting on behalf of all plaintiffs, selected three names for the trial board.[1] Although Sylvester's correspondence was sent by certified mail, Pierce claimed that he never saw it.

In late September Pierce sent a second letter to Sylvester, stating that as Sylvester had not made the selections, Pierce would select the three names from the list of seven. Ultimately two of the three people selected were individuals whom Sylvester had named in his earlier letter.

The union trial was held on three separate dates in the fall of 1980. The trial board issued a unanimous decision finding that all five plaintiffs had "engag[ed] in conduct detrimental to the best interests of the association." The board then imposed a $750 fine on each plaintiff. In addition the decision of the trial board precluded plaintiffs from holding local union offices for a period of ten years.

The plaintiffs appealed the trial board's decision to International's president. John Gannon (Gannon), International's president at the time, issued a written decision denying the appeal and affirming the decision of the trial board. Gannon's decision was not issued within the sixty days required by the IAFF constitution. The plaintiffs then appealed the decision to IAFF's committee on grievances and appeals.[2] This committee affirmed the local trial board's decision.

In early 1980 the union and its members began harassing plaintiffs. After plaintiffs took the promotional examinations in May, the harassment increased. The plaintiffs, in their brief, summarized this conduct as follows:

1. The plaintiffs' personal quarters were vandalized and their belongings were covered with shaving cream and brass polish. The damage occurred inside the fire stations, in areas that were accessible only to the other firefighters. The damage was so severe that the Pawtucket police were called to investigate. Shortly after Gendreau's private quarters were vandalized, he suffered a heart attack.

2. The word "SCAB" was written on plaintiffs' bedspreads, pillowcases, and equipment.

3. The union's checkbook refers to plaintiffs as "scabs."

4. The words "SCAB" and "PIG" were written across Gendreau's paycheck.

5. The plaintiffs received harassing phone calls at all hours, day and night.

6. The other firefighters would lock Sylvester out of the fire station, and they would lock Lundgren out of his personal quarters.

7. Oil was poured all over the front seat of Gendreau's car when it was parked at the station.

8. "Scab" was written next to Sylvester's name when it appeared on a notice on the bulletin board at the Roosevelt Avenue fire station.

9. All camaraderie and socializing between plaintiff battalion chiefs and their firefighters ceased. The firefighters even refused to march directly behind the battalion chiefs in a parade.

10. The following notice was signed by twenty firefighters and posted at station

---

1. International claims that it was unaware that Sylvester was acting on behalf of all plaintiffs.

2. The committee on grievances and appeals is the final stage in IAFF's internal appellate process. *See Constitution and Bylaws of the International Association of Fire Fighters,* art. IV, sec. 6C (1978).

2 on Roosevelt Avenue: "If you agree that no convicted scabs or not paid up scabs or scum that are suing our union cannot drink our kitty's coffee or participate in our kitty, sign below, majority rules."

11. Sylvester was unable to complete a master's degree at Rhode Island College because other firefighters refused to substitute for him on the nights he had to attend classes.

12. Sylvester was often left to fight fires by himself.

13. Local 1261 ignored Lundgren in its negotiations with the city of Pawtucket. It failed to negotiate a pay raise for Lundgren when all other union members received a raise.

14. Next to Scully's name on the union's original charter, the word "scab" was written in red letters.

As a result of the actions of local 1261 and its members, plaintiffs retired earlier than they had planned, and some plaintiffs did so at the cost of lost pension benefits.

In 1983 the five plaintiffs brought lawsuits against William McGill, local 1261, and International. These complaints alleged that defendants had intentionally inflicted emotional distress, had breached a duty of fair representation, and had defamed plaintiffs.

The plaintiffs served summonses and copies of the complaint only on William McGill. It is conceded that William McGill was not an officer or agent of IAFF, and it is also undisputed that IAFF was not served. Nevertheless Richard P. Brouillette (Brouillette), a member of the Rhode Island Bar, filed answers to the complaints on behalf of all three defendants.

During the discovery period, interrogatories were filed and the deposition of William McGill was taken. In addition requests for production and for admissions were filed and responses were made.

On February 28, 1985, Brouillette withdrew his appearance on behalf of all defendants, and Harry J. Hoopis (Hoopis), a member of the Rhode Island Bar, entered an appearance on behalf of all defendants. In 1986 the cases were consolidated for trial. In September 1987 a pretrial conference was held. On June 22, 1988, the matter was reached for trial.

On the first day of trial, IAFF received a phone call from Frank Montanaro (Montanaro), who at the time was the president of the State Association of Firefighters. Montanaro's reason for calling was to "check with the International to see if they could have someone come down here and testify as to International bylaws and how the charging of the individual takes place."

Montanaro spoke to Richard Hyatt (Hyatt), administrative assistant to the president of International. Hyatt told Montanaro to speak to Thomas Woodley (Woodley), who was International's attorney.[3] Montanaro then testified that he spoke to Woodley that same day. During his conversation with Woodley, Montanaro suggested that Woodley speak to Hoopis.

Hoopis testified that he spoke to Woodley twice on June 27, 1988, which was after the fourth day of the trial. Hoopis specifically told Woodley that IAFF was named as a defendant in the trial and that he, Hoopis, believed that he represented IAFF. According to Hoopis, Woodley responded that Hoopis was to continue to represent International at trial.

Among those who testified at the trial was Robert Thomas McGill (Robert McGill). Robert McGill, who was president of the Pawtucket and Central Falls Labor Council in May 1980, testified that he authored a notice entitled " 'To All Friends of Labor.' " The notice's purpose was to inform labor unions that plaintiffs, among others, "cooperat[ed] with Mayor Lynch's attempt to break municipal unions in Pawtucket." Robert McGill further testified that he con-

---

**3.** An affidavit submitted by IAFF states, "The law firm of Mulholland & Hickey in Washington, D.C. has been the General Counsel to IAFF for over 20 years." At the time of the trial, Woodley was a senior partner in Mulholland & Hickey.

sidered plaintiffs to be scabs, stating "They're all scabs."

After plaintiffs presented their case, Hoopis moved for a directed verdict on behalf of all defendants. The trial justice denied defendants' motion for a directed verdict with respect to the claims of unfair representation, defamation, and punitive damages. The trial justice did, however, grant the motion with respect to the claims of intentional infliction of emotional distress.

Once defendants presented their evidence, they renewed their motion for a directed verdict. The plaintiffs stipulated to a directed verdict in favor of William McGill in his individual capacity on all counts. The trial justice also granted a directed verdict in favor of IAFF on the claim of defamation and reserved his decision on the balance of the claims.

The trial justice then instructed the jury. At the conclusion of his charge, only plaintiffs objected. The trial justice then gave a "jury verdict sheet" to the jury. The verdict sheet contained seven questions. Three questions concerned liability, two concerned compensatory damages, and two concerned punitive damages. No objections were made to the form or to the content of the verdict sheet.

The jury, after deliberation, returned verdicts against both local 1261 and IAFF. The jury awarded each plaintiff $75,000 in compensatory damages and $25,000 in punitive damages against local 1261 on the defamation claims and the breach-of-the-duty-of-fair-representation claims. The jury also awarded each plaintiff $15,000 in compensatory damages and $10,000 in punitive damages against IAFF on the breach-of-the-duty-of-fair-representation claims.

On July 8, 1988, each defendant moved for a new trial. The motion for a new trial was heard by the trial justice on July 27, 1988. At that time, Richard Skolnik, a member of the Rhode Island Bar, entered his appearance on behalf of IAFF, and Hoopis withdrew his appearance. Hoopis remained as counsel for local 1261.

At the hearing on the motion for a new trial, defendants reminded the trial justice that he had reserved his decision on the motion for a directed verdict at the end of the trial. At this point International first argued that there was failure of service of process upon International as required by G.L.1956 (1985 Reenactment) § 9–2–12.

The trial justice rendered a decision on both motions. He denied the motions for a directed verdict, finding that there was "a substantial jury question for the jury to decide." The trial justice noted that the claim of improper service "ha[d] only been raised some three and a half weeks after the trial, when the dust ha[d] settled." The court concluded that the claim was "not raised, it was not argued, and it certainly was not proved" at trial.

The trial justice also considered defendants' motion for a new trial. The court summarized the evidence of harassment imposed upon plaintiffs by the union. The court noted that "the record is replete with a course of conduct that this jury could believe * * * and which this court does believe was carried on to the detriment of these people, without any thought given whatsoever of their rights as union members or as individuals and respected members of the fire department." The trial justice found that the jury was justified in awarding both compensatory and punitive damages. Consequently he denied defendants' motion for a new trial.

On December 28, 1988, IAFF moved to vacate the judgments entered by the trial justice. In support of the motion, IAFF claimed that it had never been served with process and that it had not learned that it was a defendant in the case until after judgment. The Superior Court justice who heard the motion to vacate, however, found that International had received actual notice of its status as a defendant on the first day of trial. Consequently he denied IAFF's motion to vacate and ruled that IAFF was bound by the judgment. International appealed the denial of the motion to vacate.

This matter comes before us on appeals taken by local 1261 and IAFF on the motion for a directed verdict and the motion for a new trial. In addition IAFF appeals from the denial of the motion to vacate the judgment entered against it. We shall first address the appeal of local 1261.

Local 1261 charges that the trial justice erred in failing to grant its motion for a

directed verdict and in failing to grant its motion for a new trial. Local 1261 raises six issues on appeal. We shall concern ourselves only with the claims that merit consideration.

First, local 1261 claims that the use of the term "scab" is not actionable in labor disputes. Local 1261 relies on the United States Supreme Court's decisions in *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), and *Linn v. United Plant Guard Workers of America Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Both *Old Dominion* and *Linn* involve federal law pre-empting state-law defamation actions in the context of labor disputes.

In *Linn* an assistant general manager of a detective agency filed a suit against the union, alleging defamation. The Supreme Court first noted that the National Labor Relations Act (NLRA) applied to both the plaintiff and the defendant. The Court pointed out that the NLRA was passed by Congress to implement a national labor policy. Part of this policy was to encourage "'debate [that is] uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks.'" 383 U.S. at 62, 86 S.Ct. at 663, 15 L.Ed.2d at 590. However, the goal of the NLRA is to be counterbalanced with a defamed party's right to redress, that is, "to compensate the victim and enable him to vindicate his reputation." *Id.* at 63–64, 86 S.Ct. at 663, 15 L.Ed.2d at 590. The Court in *Linn* concluded that the NLRA limits state law remedies for defamation to situations in which the defamed party proves malice. *Id.* at 64–65, 86 S.Ct. at 664, 15 L.Ed.2d at 591.

In *Old Dominion* the local union was selected by a majority of the postal workers as the bargaining representative, but it was not satisfied. Thus in an attempt to solicit the remaining letter carriers, the union periodically published a list of those who had not joined the union under the heading "List of Scabs." After Austin's name appeared on the list twice, Austin complained to the Richmond postmaster and the union president. Austin, while admitting that he did not know what a scab was, asserted that he would sue the union if he saw his name on the list again.

A few weeks later, the next issue of the newsletter was published. Once again the newsletter contained Austin's name under the list of scabs. The newsletter went on to note that because "'[s]ome co-workers are in a quandary as to what a scab is,'" the newsletter was reprinting "a well-known piece of trade union literature" entitled "The Scab," generally attributed to Jack London. Consequently Austin filed a defamation action against the union.

The United States Supreme Court, in an opinion delivered by Justice Thurgood Marshall, initially found that federal law applied, in the form of Executive Order No. 11491, which is similar to the NLRA. Second, the Court in *Old Dominion* was of the opinion that the newsletter was relevant to the union's organizational campaign. The Court reiterated the standard of malice adopted in *Linn;* that is, the standard that must be used to establish defamation in labor disputes is the reckless or knowing-falsehood test found in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Court concluded that as Austin did fall into one of the definitions of the word "scab," there was no malice and the newsletter was protected speech. *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

■ *Linn* and *Old Dominion* appear to agree that three conditions must be satisfied for federal law to pre-empt state law for defamation actions in labor disputes: (1) federal law must apply to the parties, (2) the defaming activity in question must reflect a legitimate and substantial interest in the union's organizational efforts, and (3) there must not be malice on the part of the defaming party.

■ However, as federal law does not apply to the facts of this dispute, we need to go no further than the first condition. The definitional section of the NLRA is 29

U.S.C. § 152. Of particular interest are §§ 152(2) and 152(3), which define "employer" and "employee" within the meaning of the act.

"The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, *or any State or political subdivision thereof.*" 29 U.S.C. § 152(2). (Emphasis added.)

Likewise,

"[t]he term 'employee' shall include * * * but shall not include any individual employed * * * *by any * * * person who is not an employer as herein defined.*" 29 U.S.C. § 152(3). (Emphasis added.)

The plaintiffs in this controversy are firefighters who are employed by the city of Pawtucket. Pawtucket is a political subdivision of the state and is therefore not an employer within the meaning of 29 U.S.C. § 152(2).[4] Thus under 29 U.S.C. § 152(3) plaintiffs are not employees within the scope of the NLRA.

As there is no federal pre-emption, we must now move on to the state law involving defamation. There is no statutory cause of action for defamation in Rhode Island. In Rhode Island the common-law cause of action of defamation is satisfied when the defamed private citizen proved "a false publication that would subject him to hatred, contempt, or ridicule." *DeCarvalho v. daSilva,* 414 A.2d 806, 810 (R.I.1980) (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 370, 94 S.Ct. 2997, 3022, 41 L.Ed.2d 789, 822 (1974)(White, J., dissenting)). Generally the intent of the defendant is not relevant in defamation actions. 414 A.2d at 810. Truth, however, is an absolute defense to libel or slander. G.L.1956 (1985 Reenactment) § 9–6–9.

In this controversy, there is little doubt that plaintiffs have satisfied the requirements for a claim of defamation. As was mentioned earlier, plaintiffs were referred to as scabs, and the word "scab" was written on their equipment, across their paychecks, and next to their names. Also there is no question of plaintiffs' being subjected to "hatred, contempt or ridicule." The only question that remains is whether plaintiffs were in fact scabs, making truth an absolute defense.

■ As a preliminary matter, however, we turn to the definition of the word "scab." In the context of a labor dispute, the word scab has four meanings: "(1): one who refuses to join a union (2): a member of a union who refuses to strike or returns to work before a strike has ended (3): a worker who accepts employment or replaces a union worker during a strike (4): one who works for lower wages than, or under conditions contrary to those prescribed by a union." Webster's Third New International Dictionary 2022 (1971).

■ Moving on to the facts of this controversy, we reiterate the following. First, the meeting that was held to consider the boycotting of the promotional examinations was not conducted according to International's constitution and bylaws. In particular, notices were not mailed to the members but were instead posted on bulletin boards. Second, although there was a vote taken to boycott the examinations, under the collective-bargaining agreement between the city of Pawtucket and the firefighters, plaintiffs had a right to take the promotional examinations notwithstanding the boycott. Third, the picket line that was established where the promotional examinations were given was not sanctioned by the union but was "only a spontaneous demonstration of the members who showed up."

Applying these facts to the definition of "scab," we are of the opinion that plaintiffs were not scabs. First, plaintiffs never refused to join either local 1261 or IAFF; indeed, they were members of both organizations. Second, plaintiffs never refused

---

**4.** The reason that political subdivisions of states are not within the ambit of the NLRA is that governmental employees usually do not enjoy the right to strike. *NLRB v. Natural Gas Utility District of Hawkins County,* 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). This is true for plaintiffs in this case. *See* G.L.1956 (1986 Reenactment) § 28–10–13.1.

to join any union-sanctioned strike. Third, plaintiffs never replaced union workers during a strike. Fourth, although plaintiffs did not obey the boycott, they never violated the terms of the collective-bargaining agreement. Thus the defense of truth fails.

As the words and actions of the union and its members are defamatory, we are of the opinion that the trial justice was correct in sending the question of defamation to the jury. We therefore deny local 1261's initial contention.

■■■ Local 1261's second claim is that plaintiffs failed to establish the union's responsibility for the actions taken by its members. We have held that a labor union may be liable for tortious acts of its members if the union authorized, participated in, or ratified the acts. *Murphy v. United Steelworkers of America*, 507 A.2d 1342 (R.I.1986). The record is replete with examples of the union's authorizing, participating in, and ratifying the defamation. First, William McGill affixed his name to the notice entitled " 'To All Friends of Labor' " that listed plaintiffs as having crossed a "union authorized picket line." Second, the word "scab" appears in union documents next to the names of some plaintiffs. Finally, as the trial justice observed, Robert McGill, when testifying, was "dripping with contempt, [and] fingered each of the plaintiffs and said 'They're scabs. They're scabs to this day.' " More importantly this issue was never raised before the trial justice. We have stated many times that matters not raised before the trial justice may not be raised on appeal. *See, e.g., Providence Lodge No. 3, F.O.P. v. City of Providence*, 542 A.2d 661, 662 (R.I.1988). We therefore deny and dismiss local 1261's second allegation of error.

Similarly, we need not reach the merits of the remaining errors alleged by local 1261, as these issues were also not raised before the trial justice when considering either the motion for a directed verdict or the motion for a new trial. "[W]e have continually stressed that issues not raised at the trial level will not be considered for the first time on appeal." *Id.* Consequently we deny and dismiss local 1261's appeal.

■■ We now turn our attention to the appeal of IAFF. The IAFF initially claims that the trial justice erred in not granting its motion for a new trial. In addition International argues that the Superior Court justice who heard the motion to vacate the judgment erred in not granting the motion. The crux of both motions is that as IAFF never received service of process, the court never obtained personal jurisdiction over IAFF. With respect to the motion for a new trial, we have stated the standard by which we are bound. This court will not disturb the trial justice's ruling unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong. *Gibbs Oil Co. v. Potter*, 471 A.2d 207, 209 (R.I.1984). We believe that the trial justice did not err in denying International's motion for a new trial.

■■ It is well established that a party may accede to a court's personal jurisdiction over it by failing to object to lack of service of process. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168, 60 S.Ct. 153, 155, 84 L.Ed. 167, 170 (1939); *Burton v. Northern Dutchess Hospital*, 106 F.R.D. 477, 480–81 (S.D.N.Y.1985); *cf.* 1 Kent, *R.I. Civ. Prac.* § 12.6 (West 1969)(party who defends a claim without objecting to court's lack of personal jurisdiction waives jurisdictional defense). This objection must be made in a timely manner. *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 623 F.Supp. 153, 155 (E.D.Pa.1985).

■■ Here the trial justice who considered the motion for a new trial found that the issue of service "was not raised, it was not argued, and it was certainly not proved." It is significant that IAFF never filed a motion to dismiss for insufficiency of service of process pursuant to Rule 12(b)(4) of the Superior Court Rules of Civil Procedure. Furthermore International never contacted the trial justice in a timely fashion regarding the lack of service of process; instead, it waited, in the words of the trial justice, "to see the outcome of the

trial." Consequently we affirm the trial justice's denial of International's motion for a new trial.

■ The IAFF also claims that it never authorized an attorney to represent it until it filed the motion for a new trial. That is, IAFF contends that it never authorized either Brouillette or Hoopis to represent it through the course of discovery or trial. As we noted earlier, Hyatt, the administrative assistant to the president of International, instructed Montanaro to contact Woodley. As Hyatt indirectly sought the advice of Woodley in his capacity as IAFF's general counsel, Woodley was authorized to represent IAFF. In turn, Woodley had the authority to retain local counsel on behalf of International. The trial justice found that International, through Woodley, authorized Hoopis to represent IAFF after the fourth day of the trial. Hoopis, in his affidavit, said he was told by IAFF's counsel to "continue to represent International in the trial." We believe that the trial justice was correct when he determined that IAFF ratified Hoopis as its attorney by requesting him to continue with the defense. Furthermore IAFF did nothing to alert the court to the fact that it was never represented by authorized counsel until the trial was over.

■ We turn now to International's motion to vacate the judgment, which was heard by a Superior Court justice who was in charge of the motion calendar (motion justice). The IAFF claims that the motion justice erred in denying its motion to vacate. We shall not disturb the court's ruling on a motion to vacate absent a showing of an abuse of discretion or an error of law. *Forcier v. Forcier*, 558 A.2d 212, 214 (R.I.1989). The motion justice believed that plaintiffs failed to serve IAFF properly and that Hoopis was mistaken when he thought he represented IAFF. The motion justice went on, however, to note that IAFF failed to notify plaintiffs or the court of the unauthorized representation. The motion justice refused to afford International "an opportunity to have two bites at the apple." We believe that the motion

justice did not abuse his discretion, commit error of law, or overlook or misconceive any evidence in denying IAFF's motion to vacate.

■ The next issue before us is IAFF's claim that its conduct was insufficient to support an action for breach of the duty of fair representation. International points out that the duty of fair representation arises as a result of a union's status as exclusive representative of a group of employees, and it applies only in dealings with an employer. *See Belanger v. Matteson*, 115 R.I. 332, 337–39, 346 A.2d 124, 129–30 (1975). The IAFF argues that local 1261, not IAFF, is the exclusive representative of plaintiffs with respect to collective-bargaining agreements with the city of Pawtucket. Furthermore IAFF argues that this matter involves an "intra-union" dispute, not a dispute between labor and management.

Although this argument may have some merit, we need not discuss it as it was never properly before either the trial justice or the motion justice. As we noted in the discussion of local 1261's appeal, we shall not consider on appeal issues that were not properly raised at trial. *See Providence Lodge No. 3*, 542 A.2d at 662.

■ The final issue we shall consider is whether plaintiffs may recover punitive damages. International invites this court to deviate from the general rule that bars the review of trial errors when there is a failure to object in a timely fashion and inform the trial justice of the grounds for the objection. *A.R. Alvernas, Inc. v. Cohen*, 420 A.2d 78 (R.I.1980); *Johnson v. Palange*, 122 R.I. 361, 406 A.2d 360 (1979); Super.R.Civ.P. 51(b). We decline the invitation.

Earlier in this opinion, we rejected IAFF's arguments that it was not properly before the court and that it was represented by an attorney that it never retained. We found that IAFF yielded to the court's jurisdiction and ratified the acts of the attorney whose representation it had received at trial. As we are of the opinion that there are no extraordinary circumstances that qualify as an exception to Rule 51(b),

we refuse to overturn the jury verdict on the issue of punitive damages.

After considering the appeals of both local 1261 and International, we believe that neither the trial justice nor the motion justice erred. We therefore affirm the rulings with respect to all the motions. The appeals of local 1261 and IAFF are denied and dismissed, and the judgment of the Superior Court is affirmed.