**Clifton O. WOODMANSEE et al.**

v.

**STATE of Rhode Island et al.**

No. 91–366–A.

Supreme Court of Rhode Island.

June 18, 1992.

Ronald W. Delsesto and Barbara Bennett, Delsesto & Bennett, William J. McGair, McGair & McGair, Providence, for plaintiff.

Armando Monaco, Cranston, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on appeal by the defendant, the State of Rhode Island Water Resource Board (board), from a judgment entered in favor of the plaintiffs, Clifton and Virginia Woodmansee (the Woodmansees), after a jury-waived trial. We affirm the judgment of the trial court.

On October 18, 1985, the Woodmansees filed a petition for assessment of damages in the Superior Court, requesting that a trial justice determine the fair-market value of land they owned that the board had condemned on March 12, 1985. Following a jury-waived trial the justice issued an amended decision on February 13, 1991. He found that as a result of the condemnation the Woodmansees had incurred damages in the amount of $149,591 plus statutory interest in addition to the $44,780 that the board previously paid. A judgment was entered. The board has filed a timely appeal.

Prior to March 12, 1985, the Woodmansees owned a total of 50.5 acres of land located in Richmond, Rhode Island. Pursuant to G.L.1956 (1984 Reenactment) chapter 6 of title 37 and G.L.1956 (1980 Reenactment) chapter 15 of title 46, the State Properties Committee on March 12, 1985 authorized the board to acquire by condemnation 12.66 acres plus two easements of 5,427 and 4,070 square feet of the Woodmansee property for water-supply pur-

poses. On that same day the board filed a deed of condemnation as required by § 37–6–14 in the town of Richmond. The condemned property was acquired for a well site because a large aquifer located beneath it was capable of providing residents of the town of Richmond with quality drinking water.[1] The condemnation was necessary because other water sources in the town had become contaminated by gasoline seeping from underground-storage tanks maintained by gasoline stations.

At trial both sides presented evidence regarding the effect that the state's well would have on the Woodmansees' remaining property. The Woodmansees presented Carleton A. Maine (Maine), an expert witness in the field of sanitary engineering. Maine testified that because the cone of influence of the state's well extended under most of the Woodmansees' remaining property, that remaining property was rendered unusable.[2] According to Maine, any liquid found within the cone of influence would with scientific certainty be pulled into the well by the suction of the well (the public's water supply), including any sewage or household detergents from a potential future subdivision on the Woodmansees' remaining property. Maine relied on a report that the engineering firm of Lee Pare and Associates (Lee Pare) had prepared for the board prior to condemnation, concerning quantity and quality testing of water found in the aquifer located under the Woodmansees' property. He testified that judging from the soil conditions, he determined that the cone of influence would extend out 1,000 feet from the well when 520 gallons per minute, or about 750,000 gallons per day, were withdrawn. As the rate of withdrawal increases, the cone of influence extends out farther from the well, according to Maine. He testified that the Lee Pare study projected that pumping 700 gallons per minute, or roughly 1 million gallons per day, would extend the cone of influence out

1,200 feet from the well. Maine further testified that the well was rated for a withdrawal rate of 2 million gallons per day, or 1,389 gallons per minute, 2.67 times greater than the test rate.

The Woodmansees also presented Joseph W. Accetta (Accetta), a real estate appraiser, to testify as an expert on the effect that the public well would have on the value of their remaining property. The board presented Joseph L. Riker (Riker), a real estate appraiser, for the same purpose. Both experts agreed that the highest and best use of the remaining property would be as a residential subdivision development.[3] However, the conclusions of the experts in regard to value were substantially different. Accetta testified about the effect that the cone of influence would have on the value of the remaining property. Riker did not believe that the public well would have an effect on the value of the remaining property, so he limited his appraisal to the value of the condemned land.

After hearing, the trial justice determined that the board's fair-market-value appraisal was limited solely to the condemned property and failed to take into account the diminution of the fair-market value of the remaining land. In order to compensate the Woodmansees for the loss in value to their remaining property, the trial justice awarded them $149,591 in addition to the $44,780 that the board had previously paid.

I

The first issue the board raises on appeal is whether the trial justice erred in calculating the fair-market value of the Woodmansees' remaining property subsequent to the establishment of a public well on the condemned portion of the land. The board argues that the trial justice erred because

---

1. "Aquifer" was defined at trial as "that area that is tributary to a certain area, that transmits water to a certain area."

2. As defined at trial, a "cone of influence" is "that underground area that is directly impacted by the drawing power of a well pump."

3. As defined at trial, "highest and best use" is "a term that is used in real estate to explain the highest and best utility of a particular piece of real estate."

he departed from the comparable-sales method of valuation. It contends that the trial justice may depart from the comparable-sales method only upon a showing that the property in question is unique or has a special purpose, and that was not the case with the property in dispute.

■■■ In condemnation proceedings the preferred method of valuation for determining the fair-market value is the comparable-sales method. *Warwick Musical Theatre, Inc. v. State*, 525 A.2d 905, 910 (R.I.1987). However, it is "within the discretion of the trial justice to depart from this method" when there is a finding that the property is unique or can be used for a special purpose. *Id.* Here, however, the trial justice did utilize the comparable-sales method of valuation in calculating the fair-market value of the remaining property. We quote from his decision the following:

"This court recognizes the comparable value methodology which is adopted in *Wordell v. Wordell*, 470 A.2d 669 [665] (R.I.1984). The court in *Wordell* stated 'in cases involving value of real estate [the Supreme Court] has suggested that such value must be established, wherever feasible, on the basis of comparable sales cited by an expert witness who has laid a prior foundation consisting of the reasons or factors upon which he has relied in arriving at his opinion.' "

The trial justice made use of the testimony of Accetta, a real estate appraiser with twenty-five years of experience, as a basis for his fair-market-value determination. Accetta testified that he had identified seven sites that he found to be comparable to the property in question. He took into consideration not only the facts that the highest and best use of the property would be as a subdivision, that the property had an ample water supply, and that some of the homes would have a water view but also the costs of development and the existence of a municipal well with a cone of influence. Since the trial justice did apply the comparable-sales method of valuation, there is no error.

## II

■■ The second issue raised by the board concerns its claim that the trial justice erred when he positioned the public well on the boundary line that divides the condemned property from the Woodmansees' remaining land. The board contends that a Rhode Island Department of Health (health department) regulation mandates that all land within a 400–foot radius of a public well must be controlled by the owner. As a result, asserts the board, the trial justice erred and acted unlawfully when he placed the well on the boundary of the two properties.

The trial justice, in his decision, stated: "Thus, this court must determine all damages that would result from being placed on the boundary of the condemned property with its cone of influence affecting substantially all of the remaining land held by the petitioners. The court finds that such an adverse effect is 'reasonably possible' and could manifest itself in a variety of forms. Those forms could include the state's increasing the volume of water pumped from the existing well, adding wells, or locating new wells closer to the property line between the condemned property and the remaining property. Certainly, any of such potential uses are 'reasonably possible.' "

The trial justice was neither mandating the position of the well nor presuming that the board would place the well within 400 feet of the Woodmansees' remaining land. Rather, he was merely demonstrating that such a circumstance, like the potential increase in the amount of water pumped from the well, could have an adverse impact on the remaining land.

The Lee Pare study indicated that the Woodmansee land lay over an aquifer capable of producing 2 million gallons of water per day, which is an amount described as sufficient to satisfy a demand the board projected by the year 2010. The report, prepared for the board prior to condemnation, projected that pumping 520 gallons per minute, or about 750,000 gallons per day, would create a cone of influence that would extend 1,000 feet from the well.

The report also projected that if the quantity of water was increased to 700 gallons per minute, or roughly 1 million gallons per day, the cone of influence would extend out 1,200 feet from the well.

Furthermore, Maine testified that although the health department mandates that the owner of a public water supply must maintain control of the land within 400 feet thereof, that figure may no longer be reasonable. Maine explained that he helped formulate the 400–foot setback requirement in the fifties when the health department was primarily concerned about disease control. Maine testified that inorganic solvents and other chemicals, that were not around in the fifties, are in common use in households and in septic tanks today and have contaminated public-water supplies in North Smithfield, Lincoln and Cumberland in spite of the fact that the wells met the 400–foot setback requirement.

When, as here, the trial justice sits without a jury we shall accord great weight to his or her findings of fact, and in the absence of a showing "that his [or her] finding as to the amount of the award was premised upon an application of an erroneous rule of law or was either clearly wrong or based upon a disregard or misconception of the evidence, it must be accepted as conclusive." *Sullivan v. Marcello*, 100 R.I. 241, 255, 214 A.2d 181, 188 (1965). In *Sullivan* we also stated that in condemnation proceedings, "if compensation is to be just it must be measured by what the condemnor can do and not by what he intends to do, it being the rule that the damages are to be assessed on the most injurious method of construction that is reasonably possible." *Id.* at 254, 214 A.2d at 188.

From the above, it is apparent that the trial justice's hypothetical worst-case scenario, that the Woodmansees might be prohibited from developing their remaining land, is reasonably possible even if the well was located 400 feet from the boundary line. The trial justice's finding in regard to the amount of the award appears to have been premised upon an application of the proper rule of law and not upon a disregard or misconception of the evidence.

## III

The board next argues that the trial justice erred in relying on the testimony of the Woodmansees' real estate expert, Accetta, because he was not qualified and was barred by Rule 703 of the Rhode Island Rules of Evidence.[4]

A review of the record in this matter reveals that the board failed to raise any objection to Accetta's testimony on the grounds that he was not qualified and failed to raise a Rule 703 objection. These arguments are not properly before this court; therefore, we need not address them. *See Lundgren v. Pawtucket Firefighters Association*, 595 A.2d 808, 816 (R.I.1991).

## IV

■ The final argument advanced by the board is that the trial justice failed to consider both the potential rights and the potential liabilities of a future developer when he determined the damage to the Woodmansees' remaining land. The board asserts that it would not be as difficult to find a developer willing to create a subdivision on the remaining property as Accetta testified at trial. The board argues that any liability a future developer might incur from contaminating the well water as a result of developing the property would be offset by an action against the board for negligent placement of the well. Therefore, contends the board, the trial justice erred when he failed to consider the civil remedies available to a developer when evaluating the damage to the Woodmansees' remaining land.

4. Rule 703 of the Rhode Island Rules of Evidence reads as follows:
  "An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence, if of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."

This argument is specious at best. Accetta's testimony was unrebutted. Logic dictates that the possibility of a future lawsuit with its attendant publicity would create apprehension in the mind of any potential developer. The possibility that an action for indemnity could be brought against the board for negligent placement of the well could hardly be viewed in a developer's mind as a basis for increasing the value of the property.

For all these reasons the board's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.