DECISION
This matter was tried by the court without a jury and involves property taken by the state under its eminent domain powers. The condemned property comprises 4.2 acres of the Plaintiff's original 10.23-acre parcel. The state paid the Plaintiff $520,324 for this partial taking of its property. The Plaintiff filed this petition for assessment of damages in accordance with R.I.G.L. (1956) § 37-6-18, alleging that the state's award was insufficient.
 FACTS AND TRAVEL 1. Plaintiff West Bay Christian School Association, Inc. operates a private school (K through 8), known as West Bay Christian Academy ("Plaintiff" or "West Bay"), which has approximately 200 students. Prior to the taking, the school operated on a 10.23-acre parcel of land at 475 School Street in North Kingstown. The parcel was designated as Assessor's Plat 149, Lot 99.
 2. Defendant Rhode Island Department of Transportation ("RIDOT" or "the state") is a state agency. On October 14, 2004, RIDOT exercised its eminent domain powers to condemn 4.2 acres of the 10.23-acre parcel.[1]
 3. RIDOT took the property as part of a highway construction project to create Route 403, a limited access highway that would provide a more direct connection between state highway Route 4 and the Quonset Point Industrial Park in North Kingstown.
 4. Pre-taking, the 10.23-acre parcel included three buildings. The first building was the school building, which is 20,066 square feet and consists of twelve classrooms, a science laboratory, a library, a gymnasium and other amenities associated with a school. The second and third buildings were duplex structures of similar size (2,083 square feet each). The parcel also contained other "site improvements," including soccer fields, a basketball court, a playground area and landscaped areas.
 5. RIDOT condemned 41% of the Plaintiff's land. Included in the taking was one of the two duplex buildings. The taking also included some of the parcel's "site improvements." Post-taking, the school building and one duplex remain intact.
 6. Post-taking, Route 403 will be significantly closer to the school's classrooms and playgrounds than roadways existing prior to the construction. Vehicular traffic along the expanded Route 403 will increase. Prior to the taking, Amtrak railroad tracks were contiguous to the portion of the subject parcel that was taken in the condemnation. Post-taking, the relocated Route 403 will run between the railroad tracks and the remaining parcel.
 7. RIDOT hired two appraisers to provide damage estimates associated with the partial taking of the Plaintiff's property. Integra Realty Resources ("Integra") determined that the value of the taken parcel, taken duplex and taken site improvements was $630,000. Peter M. Scotti 
Associates ("Scotti") determined that the value of the taken parcel and taken duplex was $315,000. Scotti did not determine values for the taken site improvements. To reconcile the primary appraisers' opinions, RIDOT hired a third appraiser.[2] The review appraiser, Andolfo Appraisal Associates, Inc. ("Andolfo"), did not conduct an independent appraisal. Instead, Andolfo reviewed the appraisals submitted by Integra and Scotti. In that review, Andolfo determined that the value of the taken parcel, taken duplex and taken site improvements was $520,324. Based on adjustments considered appropriate to bring some of the component values up to October 14, 2004 (the date of the taking) values, Andolfo considered the adjusted total value of the taking at $565,232.
 8. The Plaintiff hired William E. Coyle, Jr. Associates ("Coyle") to conduct an independent appraisal. Coyle opined that the value of the taking was $4,103,000. Coyle based this value on his determination that the remaining parcel could not sustain a school after the partial taking and therefore that the highest and best use of the property post-taking was a residential home site.
 9. The state paid the Plaintiff $520,324, the amount proposed by the review appraiser Andolfo as of October, 2003 (one year prior to the actual compensation date), to compensate for the partial taking.
 LEGAL STANDARD IN TAKINGS CASES
The Rhode Island Constitution's Takings Clause provides that "private property shall not be taken for public uses, without just compensation." R.I. Const. Art. I, § 16. Under this provision, the government must compensate a private property owner when it uses its eminent domain powers to take that owner's property and use it for a public purpose.
While many takings cases involve the taking of an entire parcel, sometimes the government takes only part of a parcel to achieve a public purpose. In such partial taking cases, "[i]t is well settled that the measure of damages . . . is the value of the land taken at the time it is taken, together with any special or peculiar damages which result to the remaining land." Hetland v. Capaldi, 240 A.2d 155, 157 (R.I. 1968) (emphasis added). Courts often refer to the damages to the remaining land — the "extent to which the fair market value of the remaining land has been depreciated as a result of the taking" — as severance damages.Id. The burden of proving damages associated with a partial taking rests with the owner of the taken property. Nasco v. Director of PublicWorks, 116 R.I. 712, 721, 360 A.2d 871, 875 (1976).
 VALUE OF THE LAND TAKEN
The first consideration in a partial taking case is "the value of the land taken." Hetland, 240 A.2d at 157. The original 10.23-acre parcel included four components: (1) the school building, (2) the two duplex buildings, (3) the site improvements and (4) the land itself.[3] The "land taken," or condemned by the state, included portions of the latter three components.[4] The state condemned 4.2 acres of the original parcel, which included one of the duplex buildings and some of the site improvements.
The Taken Duplex
Integra based the value of the duplexes on the rental income each duplex could potentially generate. Integra Appraisal at 57-59, 65. Based on its understanding that the units were suitable for lease, Integra used the Gross Income Multiplier (GIM) approach to estimate the contributory value of the duplex units. Id. at 57, 65. Scotti valued each duplex based on the market value of similar residential buildings in North Kingstown. Peter M. Scotti Associates, Self-Contained Reportof Complete Appraisal 87 (Feb. 20, 2004) ("Scotti Appraisal"). Coyle premised his appraisal on the cost to rebuild a similar structure, and utilized the Marshall Swift Residential Cost Handbook to determine those costs. Coyle Appraisal at 12. Scotti and Coyle did not provide values that reflected the maximum use of these duplexes as rental units. As a result, the court finds Integra's value for the taken duplex as most credible. Andolfo provided further support for the credibility of Integra's value for the taken duplex in its review appraisal.Andolfo Appraisal at 4 (finding Integra's approach "more preferable in deriving the South Duplex's contribution to total property value."). Thus, since the Plaintiff lost one duplex and the two duplexes are of equal value, the state should compensate the Plaintiff for the taken duplex using the GIM approach.
Integra's value for taken duplex ($302,000) is based on the date it appraised the property, not the date of the taking.[5] It is well-settled that compensation for a taking is based on the value of the property at the time of the taking, not at the time of the appraisal.O'Donnell v. State, 370 A.2d 233, 236 (R.I. 1977) One of Integra's appraisers testified to this principle and estimated that the values stated in its report should be increased by 17.5 percent because of the estimated appreciation of property values in North Kingstown from the time of its appraisal to the date of the taking on October 14, 2004. Trial Tr. vol. 2, 361, May 23, 2006. Andolfo concurred in this approach. Trial Tr. vol. 3, 533-35, May 24, 2006. Thus, the court must multiply the value of the taken duplex as of the appraisal date ($302,000) by 17.5 percent to determine its value as of the date of the taking for an award of $354,850 for the taken duplex.
Site Improvements
The original parcel included various improvements. Integra provided the most detailed analysis of these "site improvements." It estimated that the pre-taking site improvements included two soccer fields (valued at $150,000), a basketball court (valued at $6,670) and paved areas and landscaping (valued at $154,765). Integra's total pre-taking value for the site improvements, therefore, was $311,435. Integra Appraisal at 67. Neither Scotti nor Coyle separately appraised the site improvements in a manner that would enable the court to distinguish between the site improvements taken versus the improvements remaining after the taking. Thus, the Court finds most credible Integra's pre-taking value for these site improvements ($311,435).
Integra is the only appraiser which analyzed the site improvements both before and after the taking. In the absence of other evidence, the Court relies on Integra's valuation of the lost soccer field, some of the landscaping improvements and some of the value of a basketball court. Integra opined that the losses associated with these site improvements was $93,324. Using the aforementioned 17.5 percent multiplier to determine the value of the site improvements as of the date of the taking, the Court determines that the site improvements damage award is $109,656.
The Land
The appraisers disagreed sharply regarding the value of the land. The area in which the parcel is located is zoned for residential use. The Plaintiff obtained a special exception to operate a school in a residential district. Integra and Scotti based their land values on the existing zoning and examined the values of other residential lots in North Kingstown to determine the value of this land. Coyle, by contrast, examined the values of similarly-sized commercial lots in proximity to the subject property. He supported his decision to use commercial rather than residential comparisons in that "the only town zones where schools are allowed without a special exception are NB (neighborhood business), GB (general business), and PB (planned business)." Coyle Appraisal at 12. The Court finds Coyle's analysis credible because the land value of a school site is better approximated by using commercial zone comparables. The school was not razed during the taking. The existing use of this property as a school, though by special exception, is more analogous to a commercial use than a residential use. West Bay competes against other private schools to attract students. In fact, the state's appraisers opine that the parcel's highest and best use post-taking is as a school. An analysis that suggests a conversion to residential property post-taking is inconsistent with the state's own assumptions that the property will continue to support a school after the taking. For these reasons, the Court accepts Coyle's pre-taking value for the land ($891,258).
Because only a portion of the total land was taken in the condemnation, the Court must fashion a methodology to extrapolate the total land value to determine the value of the land taken.[6] The Coyle Appraisal failed to provide a separate value for the 4.2-acre parcel taken.[7] Because 4.2 acres constitutes forty-one percent (41%) of the total land value, the Court finds that the compensation for the taken land is forty-one percent of the total pre-taking value of the entire parcel, or $365,416.
In summary, for this partial taking, the state owes the Plaintiff $354,850 (for the taken duplex) plus $109,656 (for the taken site improvements) plus $365,416 (for the taken land). These component values result in a total damages award of $829,922 to compensate the Plaintiff for the taken parcel.
 SEVERANCE DAMAGES: THE DIMINISHED VALUE OF THE REMAININGLAND
The second measure of damages in a partial takings case is the diminished value of the remaining parcel after the taking.Hetland, 240 A.2d at 157. Coyle based his determination of the decreased value of the remaining parcel, often referred to as the severance damages, on his opinion that the remaining parcel's highest and best use was no longer a school. The state's appraisers disagreed with that assessment.
The "Highest and Best Use" of the Remaining Land
The term "highest and best use. . .is used in real estate to explain the highest and best utility of a particular piece of real estate."Woodmansee v. State, 609 A.2d 952, 954, n. 3 (R.I. 1992). It describes the most advantageous way in which a property owner can develop and improve a particular parcel.
To make his highest and best use determination, Coyle relied entirely on the findings of OccuHealth, Inc., a company that conducts environmental impact analyses for a wide range of clients. Trial Tr. vol. 2, 222, May 18, 2006. OccuHealth conducted an environmental impact assessment to assist in the determination of the "highest and best use" of the remaining parcel. Coyle Appraisal at 9. Neither Coyle nor his appraisal company took part in the collection of data for the OccuHealth report. Trial Tr. vol. 1, 119, May 17, 2006. Data was collected prior to the construction phase of the project and mathematical models were utilized to translate that data into projections for the operational phase of the new highway. OccuHealth determined that the state's road improvement project would have a "negative impact" on the school's environment during and after construction. Due to the increased proximity of the highway to the school's classrooms and playing fields, OccuHealth opined that increased noise would hamper classroom communication between teachers and students trying to speak over and above the outside din from "traffic related noise." Coyle Appraisal at 9. OccuHealth further opined that the new highway would have a negative effect on student playground safety because of the increased difficulty of teachers communicating with students during recesses and sporting events. In addition, after construction of the highway, "[a]ir quality modeling predictions indicate an increase of approximately 20% in both carbon monoxide particulate matter concentrations directly related to traffic." Coyle Appraisal at 9. As a result of this increased noise, decreased safety and poorer air quality, Coyle predicted that West Bay's enrollment would decline and that West Bay would struggle to attract and keep students. These predictions led Coyle to conclude that the "highest and best use" of the remaining parcel would no longer be a school, but instead a residential home site. Coyle Appraisal at 10.[8] The validity of Coyle's large damages award and his highest and best use determination are based on the reliability of OccuHealth's conclusions regarding the impact of this highway project on the remaining parcel.
The state's appraisers all disagreed with Coyle's conclusion regarding the property's "highest and best use" after the partial taking. While the details of the state's appraisals varied, both Scotti and Integra concluded that the "highest and best use" of the remaining parcel was a school, despite the loss of over four acres to the state. See ScottiAddendum at 22; see also Integra Appraisal at 45. As a result, their post-taking values were significantly higher than Coyle's $197,000 and their damages estimates were significantly lower than Coyle's $4,103,700.
Scotti based its finding regarding the remaining parcel's "highest and best use" as a school on the fact that, despite the taking of one duplex and some site improvements, "[t]he school buildings are not impaired or damaged by the acquisition." Scotti Addendum at 32. Furthermore, Scotti found that "sufficient land" still exists for outdoor recreation, exercise and athletics and that the school's plans for expansion are not necessarily "eliminated." Id. at 35. Integra came to the same conclusion regarding the remaining parcel's "highest and best use," stating that "it does not appear that the accreditation of the school is in jeopardy." Integra Appraisal at 44. Furthermore, Integra conducted a survey of other similarly-sized schools throughout the state and found that West Bay, like the schools in the statewide survey, could continue to operate as a school on the remaining smaller parcel. Id. at 45.
While the Court recognizes that West Bay has lost a significant portion of its property in this partial taking, the Court rejects West Bay's premise that the "highest and best use" of the remaining parcel is a single family residence. The Plaintiff failed to satisfy its burden of proving that the remaining parcel post-taking was unsuitable for use as a school. To prove that the school essentially would be forced to close its doors, the Plaintiff relied on conclusions regarding several factors: (1) increased noise, (2) increased pollution, (3) decreased safety, (4) insufficient grounds and (5) decline in student population. However, West Bay provided insufficient evidence to support these conclusions.
Regarding the increased noise and pollution students and teachers would face post-taking, the plaintiff relied heavily on the OccuHealth environmental assessment. However, the methods used by OccuHealth to gather data on these factors were flawed. During his testimony, OccuHealth vice president A. David Scarchilli testified that the noise and pollution samples taken by OccuHealth were collected outdoors, but that no samples were taken inside the school building. Trial Tr. vol 2, 269, 272 May 18, 2006. Failure to provide evidence regarding the future impact of noise and pollution levels indoors undermined the credibility of the OccuHealth report. The fact that the school is air-conditioned further brings into question OccuHealth's findings. Trial Tr. vol. 1, 110, May 17, 2006. With air-conditioned classrooms, the school can operate in warmer weather without the need for open windows. If the windows are not opened, then students and teachers need not endure the outdoor noise that OccuHealth measured. Furthermore, the Court questions the accuracy of OccuHealth's outdoor samples. Under cross-examination, Scarchilli conceded that the noise analysis "assumed that the speed [of motor vehicles] on the future Route 4 will be 55 miles an hour." Trial Tr. vol. 2, 277, May 18, 2006. The evidence presented was not conclusive regarding the eventual speed limit on this road.
To predict future noise levels after the completion of the highway, OccuHealth relied on "modeling" performed by a non-testifying company identified as Tech Environmental.[9] Noise data was not collected on a continuous input basis, and, for that reason, its reliability was questioned by Tech Environmental:
 Unfortunately, in this particular case the background data's variability played a factor in the results. Some of the total noise results are above the concern level and some are below. If continuous input data were collected it is likely that the overall background conditions would become more normalized and a more definitive conclusion would be developed.
Letter from Matthew L. Riegert and Michael T. Lannan, Tech Environmental, Inc., to Dave Scarchilli, OccuHealth, Inc. (May 25, 2005).
In addition, it is clear from the Tech Environmental report that air quality standards at the school will remain in compliance with Rhode Island and National Ambient Air Quality Standards (NAAQS) even after the operation of the highway. Id.
Finally, the noise and pollution samples on which the Plaintiff relied did not take into account the state's plan to depress the grade of the new road surface by several feet. Trial Tr. vol. 2, 281, May 18, 2006. Thus, the traffic noise measured by OccuHealth is inconclusive and potentially misleading because a depressed grade likely will lead to less noise than its outdoor measurement samples revealed. By assuming a level grade between the school grounds and the road, OccuHealth undermined its conclusion that the noise would force the school to close. A credible noise analysis should have accounted for the difference in grade between the highway and the school property. In addition, West Bay has the option of lessening the noise that comes from the road by erecting noise barriers. Id. at 284.
While overstating the increased noise and pollution that would ensue post-taking, Coyle also exaggerated the pristine setting West Bay enjoyed pre-taking. Coyle conceded the existence of the nearby railroad tracks connecting Amtrak's Providence and Kingston routes but, during his trial testimony, seemed reluctant to recognize the noise associated with those train tracks. When asked about the tracks' proximity to West Bay and the noise associated with them, Coyle responded, "it's not as bad as the trains that go by my house." Trial Tr. vol. 1, 124, May 17, 2006. Coyle's failure to recognize the noise created by trains and the impact of train noise on the existing school environment undermined his assertions regarding any "new" noise that would result from the new highway.
Another weakness in the Plaintiff's case was its failure to recognize that other Rhode Island schools operate on parcels of land equal to or smaller than the land that will remain after the taking. Trial Tr. vol. 1, 120, May 17, 2006. Integra, by contrast, identified six parochial and private schools located on parcels ranging from 1 to 6.83 acres in its analysis, pointing out that they operate as schools and maintain their accreditation, even with student populations greater than West Bay.Integra Appraisal at 45. When asked at trial about his inclusion of these schools in his analysis, the Integra appraiser responded, "[a]s an appraiser, I felt it was definitely prudent and necessary to determine if there are other schools in. . .Rhode Island that are operating on land areas similar to the subject property." Trial Tr. vol. 2, 353, May 23, 2006. Integra used this data in part to support its conclusion that West Bay could continue to operate as a school on its remaining six-acre parcel, as well as its related conclusion that the remaining parcel's highest and best use is a school. The schools surveyed by Integra may not provide perfect parallels to West Bay, but Coyle's failure to include them in any way in his analysis represented a significant oversight. Coyle's further inability to explain this omission at trial brings into question his conclusion regarding the remaining parcel's highest and best use.
Perhaps the Plaintiff's most glaring omission was its failure to provide testimony from an educational expert regarding the impact of the partial taking on the school's continued operation. Neither Coyle nor OccuHealth is an educational expert and neither is qualified to provide opinions on the impact of this taking on the educational environment. There was evidence from lay persons regarding their qualitative assessments of the taking's impact on West Bay. At trial, certain parents of existing students expressed doubts about keeping their children enrolled. One parent testified that, during the tours she conducted, "[j]ust about every family expressed concern — safety concerns about the highway being so close to the school." Trial Tr. vol. 3, 567, May 24, 2006. Another parent testified, "I have always recommended West Bay, and I, unfortunately, have stopped doing that." Trial Tr. vol. 3, 576, May 24, 2006. When asked why she stopped, she replied, "I'm not comfortable recommending something I'm not sure about." Trial Tr. vol. 3, 567, May 24, 2006. Although reflective of honest concern, this anecdotal evidence does not provide an objective evidentiary foundation for a conclusion that the property cannot continue to support a school after the condemnation.[10]
Regarding the remaining parcel's highest and best use, the Court finds the evidence presented by the state more credible. The six-acre parcel can maintain a school. The main school building remains intact. The school grounds remain essentially as they were before the taking. Some outdoor fields have been lost, but others remain or were moved, and outdoor athletic activities have not come to a halt.[11] The increase in noise will not force the school to close its doors. After the highway is built, the air quality will comply with EPA standards, as even the OccuHealth witness confirmed in his testimony. Trial Tr. vol. 2, 275, May 18, 2006. The students and teachers at West Bay already cope with the noise generated by nearby train traffic. Whatever "new" noise is created by the highway was not convincingly established and could be mitigated. West Bay's claims of decreased safety have been overstated. Perhaps most importantly, no educational professional came forward to describe the impact of the taking on the school operations. Finally, the North Kingstown Town Planner testified that West Bay — or another school if West Bay closed its doors — could operate on the remaining parcel under the existing special use permit. Trial Tr. vol. 2, 208, May 18, 2006. In short, while its setting may be less desirable than it was previous to the taking, the school can — and does — continue to operate as a school. Therefore, the Court finds that the "highest and best use" of this parcel after the taking remains a school.
Quantifying Severance Damages
The highest and best use determination does not necessarily end the Court's partial taking inquiry. The Court still must examine any evidence regarding the diminished value of the remaining parcel. Neither side presented any evidence on this issue. The Plaintiff relied on its experts' opinion that the highest and best use of the remaining parcel was not a school, and provided no alternative theory regarding severance damages.[12] The state offered no evidence regarding the diminished value of the remaining parcel.
The state's appraisers were of the opinion that the remaining parcel lost no value because it could continue to support the same school on a smaller parcel. Therefore, they declined to impose severance damages. Petitioners' Post Trial Mem. at 12 (Sep., 2006). This observation seems questionable in light of the accommodations and expense that may be necessary to continue its school operations on a smaller parcel in an area now burdened by the imposition of a new highway "neighbor." In addition, any specific plans to expand may have to be adjusted or scrapped.
It is the Plaintiff, however, and not the state, that bears the burden of proving and quantifying any diminished value to the remaining school parcel. Unfortunately, West Bay has asked the Court to accept its evidence of its inability post-taking to operate a school on the remaining parcel, but has produced no evidence to quantify a loss in value to the parcel if it were to remain as a school. This deficit in proof is fatal to the claim of severance damages, since the Court cannot engage in speculation in determining severance damages or the amount thereof.
 CONCLUSION
The major issue in this trial was the highest and best use of West Bay's remaining parcel after the state condemned 41% of its property. The Court finds that the highest and best use of that remaining parcel is a school.
Under partial takings jurisprudence, West Bay is entitled to damages for two losses in the wake of this condemnation: (1) the value of the taken parcel and (2) any diminished value of the remaining parcel, also known as severance damages. During this trial, the parties presented evidence regarding one set of losses — the value of the taken parcel. Based upon the evidence the Court deems most credible, Plaintiff is entitled to $829,922 for the loss of 4.2 acres of its property. The Plaintiff failed to meet its burden of quantifying the diminished value of the remaining parcel. Thus, West Bay can receive compensation only for the loss associated with the taken parcel and is not entitled to additional severance damages. For the foregoing reasons, judgment shall enter for the Plaintiff in the amount of $829,922, with additional interest pursuant to R.I.G.L. (1956) § 37-6-17. The parties shall prepare an appropriate form of judgment consistent with this decision.
[1] The state, through RIDOT, originally intended to take approximately 5.2 acres of the 10.23-acre parcel, which would have comprised more than one-half of the Plaintiff's original parcel. The state reduced the size of the taking from 5.2 to 4.2 acres. This change explains the reason for the addendum appraisals submitted by the state's appraisers and included as exhibits at trial. The original appraisals were based on a taking of 5.2 acres; the addendum appraisals were based on a taking of 4.2 acres.
[2] The third appraisal, conducted by Andolfo Appraisal Associates, Inc., was a "review" appraisal. See Letter from Thomas S. Andolfo, Certified General Appraiser, Andolfo Appraisal Associates, Inc., to David J. Sasso, Transportation Support Administrator, Rhode Island Department of Transportation (June 14, 2004) ("Andolfo Appraisal"). The review appraisal process involves "reviewing the appraisals that are submitted. . .by the individual appraisers, reviewing or viewing the subject properties. . .and trying to estimate whether or not those [appraisal] reports were completed in a credible manner,. . .met the uniform standards of professional appraisal practice" and were reasonable. Trial Tr., vol. 3, 520, May 24, 2006. Ultimately, the review appraiser uses all of the information he gathers to provide a recommendation for the amount the state should pay for a taking.
[3] Each appraiser provided a value for the original parcel. Scotti valued the original parcel at $3,716,000. Peter M. Scotti Associates,Addendum to Self-Contained Report of Complete Appraisal 30 (Feb. 20, 2004) ("Scotti Addendum"). Integra valued the original parcel at $4,090,000. Trial Tr. vol. 2, 362, May 23, 2006; Integra Realty Resources, Complete Appraisal in a Self-Contained Appraisal Report 69 (Feb. 4, 2004) ("Integra Appraisal"). Coyle valued the original parcel at $4,300,700. William E. Coyle, Jr. Associates, Appraisal Report 15 (Oct. 14, 1004) ("Coyle Appraisal").
[4] While the school building represented the largest component of the original parcel, the building was untouched during the taking and remains standing. Thus, this component does not contribute to the Plaintiff's damages award relative to the value of the land taken.
[5] The Coyle Appraisal, by contrast, based its opinions on the values associated with the property on the date of the taking — October 14, 2004.
[6] Special use property is property that "has no definite and ascertainable market value because. . .[it] is not regularly bought and sold on the open market." Capital Properties v. State, 636 A.2d 319, 322
(R.I. 1994). Schools generally are considered special use property.See State Highway Commissioner v. Bd. of Educ. of the City ofElizabeth, 282 A.2d 71, 78 (N.J.Super. 1971). In takings cases involving special use property, a trial court has the discretion to depart from traditional valuation methods to properly compensate the party whose property has been taken. See City of Tulsa v. Mingo SchoolDistrict No. 16, 559 P.2d 487, 493-94 (Okla.App. 1977).
[7] Rather than provide a damages estimate for the taken 4.2 acre parcel, Coyle opined that the "highest and best use" of the remaining parcel after the taking was no longer a school. See discussioninfra.
[8] To determine the post-taking value of the remaining parcel, Coyle examined other residential home sites. Comparable sales data of other similarly-sized vacant residential lots in North Kingstown led Coyle to opine that the post-taking value of the remaining parcel was $197,000.Coyle Appraisal at 14. Coyle subtracted the post-taking value of $197,000 from its pre-taking value of $4,3000,700 to estimate the damages associated with this partial taking at $4,103,700. CoyleAppraisal at 15.
[9] Since OccuHealth data was collected prior to the construction phase, the effect on the site of increased noise and pollution after construction of the highway is totally reliant on the credibility of the "air quality modeling predictions" provided to OccuHealth by Tech Environmental.
[10] With regard to this issue, the Plaintiff correctly states that other courts have determined that fears of potential buyers regarding a property's future value are admissible to determine the market value of that property. See Ryan v. Kansas Power Light Co., 815 P.2d 528, 533
(Kan. 1991). Courts often look to the reasonableness of those fears to determine their persuasiveness. Id. Such reasonableness often stems from the opinion of a qualified or expert witness, rather than the personal views of non-experts. Id. at 534. In the absence of objective expert testimony, this Court finds such personal observations to be "speculative, conjectural, and remote," id. at 535, and of limited assistance in the Court's efforts to quantify severance damages or to determine the highest and best use of the remaining parcel. Furthermore, even if this Court were to rely on the subjective views of concerned parents, such views would only be admissible to determine the extent to which a hypothetical buyer's fears decrease the market value of a particular property. They are not relevant when the court is confronted with "special purpose" property, such as school property, that is not ordinarily bought and sold in the marketplace. See State HighwayCommissioner v. Bd. of Educ. of the City of Elizabeth, 282 A.2d 71, 78
(N.J.Super. 1971). Also, no case has been cited to suggest that a determination of "highest and best use" can be made in the absence of expert testimony.
[11] The Plaintiff failed to identify what efforts or costs might be associated with locating available "off-campus" sites for additional recreational space.
[12] One such alternative theory is the introduction of evidence of "restoration or replacement costs" to restore the property owner to the position he would have occupied had the taking not occurred. City ofTulsa, 559 P.2d at 493-94. A 1971 New Jersey case provides an example. In it, the school's architects provided specific dollar estimates for the air-conditioning, landscaping and soundproofing the school would need because of the increased noise and pollution associated with the partial taking. City of Elizabeth, 282 A.2d at 81. In a similar vein, the Fourth Circuit, while addressing a partial taking of school lands, ruled that "replacement cost or substitution cost is appropriate" in determining compensation. U.S. v. Bd. of Educ. of the County ofMineral, 253 F.2d 760, 761 (4th Cir. 1958). This substitution principle has been called the "substitute facilities doctrine." City ofTulsa, 559 P.2d at 494 (emphasis added). Under this doctrine, the trier of fact focuses not on the decreased market value of property, but on the cost of "equivalent facilities or necessary measures to restore the utility of the property." Id.